UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

        v.

DONALD GARDNER, JR.,

        Defendant.

_____

**15-CR-179-FPG**

**SENTENCING MEMORANDUM**



      Donald Gardner, Jr. is a mentally retarded 42-year old man who has lived with his mother on their family farm in Lafayette, New York for the vast majority of his life.  He has no prior criminal history whatsoever.  Donnie's significant intellectual limitations, the extremely uncharacteristic and isolated nature of his criminal conduct, and his low recidivism risk, make a 24-month sentence with an extended period of supervision a fair and just resolution of this case.

# Who is Donnie?

To the people that know him best, Donnie is a loving and caring person.  Someone that you can depend on, that likes to please people, and that always wants to help.  But what makes Donnie different -- and what makes this case different -- is gleaned from a very simple, innocuous line in his aunt's letter:



*Donnie posing for elementary school yearbook*

> I hope this letter will help you understand Donnie better he really is a good kid.
> - Sandra Recor, Exhibit C

". . . *he really is a good kid*."  Donnie is a middle-aged man, but he is still a child intellectually.  His intellectual limitations were evident at a very young age.  Diagnosed with a severe learning disability as a young child, he did not learn to speak until age 3.  After being held back in the 1st grade, Donnie was evaluated by a psychologist who reported that he was in the low average range in intellectual abilities and appeared developmentally immature.  Donnie was



*Donnie's high school graduation*

eventually placed in special education classes in fourth grade.

In high school, Donnie attended BOCES, but was unable to complete the program.  As he was still reading at a 3rd grade level, he was again evaluated by a psychologist who reported that Donnie was on the Low End of the Borderline Range of intellectual functioning.

Viewed in total, his school records demonstrate that Donnie was socially promoted and eventually graduated Tully High School in 1994 with a local diploma.

2

After graduation, Donnie worked 23 different jobs in 10 years -- all either food service or laborer jobs.  Throughout his employment history, Donnie's responsibilities have been limited.  He has never been tasked with operating a cash register or communicating with customers.  Indeed, Donnie does not handle finances of any kind.  He cannot handle money; he does not understand how credit cards work; he has never had a bank account; his mother pays all of his bills.

Unfortunately, Donnie has been terminated numerous times for not being able to meet minimum work standards.  His longest term of employment at Lee's Feed was obtained as a favor to his father, who was a close friend of the owner.  At Lee's Feed, he worked strictly as a laborer under close supervision from the owner.  Donnie was eventually terminated because he made a rude joke to a customer.  As a result, the owner contacted Donnie's mother and advised her that Donnie could no longer work there.



When Donnie is not working, he helps his mother around their large, multi-acre farm with household chores, basic repairs and farm duties.  The Gardner farm sits on a rural road approximately 3 miles north of the Town of Lafayette, alongside US-11 and I-81.  The closest school is Lafayette Junior/Senior High School approximately 2.6 miles away; the only restaurant within 3 miles sits over 1 mile north on the other side of the thruway; and, the nearest park is approximately 14 miles away.

*View of the Gardner farm looking out from the back porch (top) and to the right of the back*



These chores and duties include repairs to the fence around the farm. Some fences are to maintain the pasture for the cows and the rest are to set the farm boundary. According to his mother, Donnie became an "expert" fence repairman.



*Donnie would help fix the boundary fence (top) and pasture fence (bottom)*

Likewise, Donnie helped to maintain the farm equipment. He learned how to change a flat tire on the tractor from watching his late father do it for thirty years. Donnie also kept the farm in order at the direction of his mother and under her supervision. He cleaned the manure from the shed and hauled the 900 lb. hay bales from the field to the barn.

Without Donnie around, his mother has not been able to maintain the shed properly, and has had to hire people to fix her farm equipment and haul the hay bales, as she is unable to do so.





*900 lb. hay bales waiting to be hauled (left)*



*The shed that Donnie once kept spotless and neatly organized (right)*

4

Donnie's tasks did not just include hard labor. The Gardner farm has always opened its doors to stray dogs and abused and neglected animals. The farm currently shelters several horses and dogs that have endured pain and suffering at the hands of their prior owners, including gashes to the face, severed tongues, and serious wounds to the animals' legs.



*Donnie's mom tending to Milly, who has a permanent gash under her right eye*

Donnie's mother muses that one of his most important tasks was to entertain his elderly aunt, Aunt Berdel, who now resides at the Gardner home. She, too, remains supportive of Donnie.



*Donnie loves his five rescue dogs*



*Aunt Berdel rarely smiles*



*The Gardner farm is down to only two cows without Donnie available to help*



*Donnie as a baby with his parents and older brothers*

Donnie has never lived alone and does not have the ability to live independently.  Quite the opposite, he is extremely dependent on his mother.  Donnie did everything with his parents.  He helped on the farm, followed his dad around town, camped together, and even played in a family band together.



*The Gardner Family Band*
*Top: Donald Gardner, Sr. and Carol Gardner*
*Bottom: Donnie in middle with family friends on each side*

Donnie is also extremely close to his stepbrothers Doug and Russel.  They grew up together.  Being older, Doug and Russel took care of Donnie when Donnie was bullied in school.  Although Russel lives in Texas and does not communicate with Donnie often, he remains supportive.  Doug still lives nearby and speaks with Donnie regularly, and is also supportive.



*Donnie and his brother Doug*



*Donnie with his uncle, father, and brother Doug*

6

> *I will always remember all the things Dad love to do.*
> *Dad will always be remembered as the greatest.*
> - Donnie Gardner, Jr., Exhibit A



*Portrait of Donnie and his father, Don, Sr., hanging in Donnie's room*

Donnie idolized his father.  Tragically, right before Donnie was charged in this case, his father was diagnosed with lung cancer.  He died 7 months later.  Donnie was, and still is, devastated.



*Donnie's mom Carol Gardner*

Sadly, Donnie had promised his dad right before his passing that he would take care of his mom.  So the devastation at the loss of his father is compounded by the fact that he is now behind bars, all while his 70-year-old mother is suffering her own health issues.  Donnie's mother is a cancer survivor herself, and she recently underwent serious eye surgery and a total hip replacement.  Although she is recovering, she struggles to walk around her home, let alone tend to their farm.  Doug helps on the farm as much as he can; however, he works full-time and is often required to work overtime hours.  Should anything ever happen to their mother, Doug has made clear that he will take care of Donnie.

# What did Donnie do?

The core offense conduct here occurred during a 10-minute span on February 2, 2014. Specifically, between 17:15 UTC and 17:25 UTC, Victim sent three pornographic images of herself to Donnie through Facebook at his request.

> Core offense conduct occurred during 10-minute span

No additional child pornography was discovered on the five devices seized from Donnie's home.  In fact, a review of the discovery by our forensic expert indicates that he was not specifically targeting underage girls.

> No additional child pornography found on any of the five devices seized from the Gardner home

Donnie and Victim began messaging each other through Facebook on February 1, 2014, after Victim commented on his profile picture, which contained an image of a boy.  Notably, Donnie's Facebook account also contained numerous pictures of himself, and he even admitted truthful facts about himself, including that he worked at Lee's Feed.  The messages from February 1, 2014, are unavailable, but the communications from February 2, 2014 --including both pornographic and non-pornographic images sent by Victim -- are available.

> Evidence shows that Donnie was not targeting underage girls

On March 21, 2014, Donnie's Facebook account was disabled.  Our forensic expert advises that Facebook may have disabled the account on its own, as there is no indication that Donnie was aware that there was a criminal investigation.  Importantly, there is no evidence that he attempted to alter his Facebook account in any way, such as changing the profile picture or deleting messages or images.  Donnie was ultimately charged on September 24, 2015.

> There was no suggestion of physical contact with the minor by Donnie

# What exactly does Donnie suffer from?

When first meeting Donnie, it is evident that he has some intellectual limitations.  After several meetings, the true extent of his significant intellectual disability is exposed.

> Donnie talks a lot, but he doesn't say a lot
> - Dr. Rutter, Exhibit G, quoting Carol Gardner

Consequently, the defense retained Dr. Michael Rutter to perform a psychological evaluation of him.  Dr. Rutter diagnosed Donnie with Mild Mental Retardation with significant intellectual and developmental deficits that contributed substantially to his actions related to the instant offense.  Dr. Rutter further opined that Donnie will never achieve an intellectual level to assist adequately in his own defense as he does not possess the ability to understand and weigh the decision about whether or not to testify, understand the consequences of his answers, and has very limited capacity to understand plea negotiations.

Based, in part, on Dr. Rutter's report, concerns arose regarding Donnie's competency.  As a result, the defense retained Dr. Ana Natasha Cervantes and Dr. Melissa Heffler to perform a competency evaluation.  Dr. Heffler diagnosed Mr. Gardner with Intellectual Disability, Mild Severity, and ultimately found Donnie competent to stand trial.

After Donnie was detained on a bail violation, he was ordered to the custody of the Bureau of Prisons for the purpose of a competency evaluation.  Dr. Kari Schlessinger diagnosed Donnie with Borderline Intellectual Functioning, but also ultimately found him competent to stand trial.  Dr. Schlessinger did indicate, however, that Donnie suffers from genuine and significant intellectual and cognitive impairment.

The diagnoses of Dr. Rutter and Dr. Heffler of a "mild" mental retardation and the diagnosis of Dr. Schlessinger of a "borderline" intellectual disability can be misleading.  In fact, Dr. Ana Natasha Cervantes cautioned that most intellectual/mental disabilities are classified as

9

"mild."  The impairments associated with such disabilities are not mild in comparison to normal

functioning.  It is inaccurate to compare those diagnosed with these deficits to the entire

population and deeming them only "mildly disabled."

> The impairments associated with such disabilities are not mild in comparison to normal functioning
> - Interviews with Dr. Cervantes and Dr. Rutter

What is undisputed among the doctors is that individuals like Donnie with IQ scores higher than individuals diagnosed with severe intellectual disabilities, but with limited cognitive and adaptive functioning, have problems in everyday functioning, judgment, and academic or occupational achievement.  Additionally, these same individuals may function well

enough at times to make it difficult to determine definitively that there is a deficit present

requiring assistance.  Thus, it is imperative to assess the adaptive functioning skills of a mentally

retarded or an intellectually disabled individual for a more accurate understanding of the person's

intellectual abilities.

Examples of adaptive functioning skills include adequate social functioning, romantic relationships, the ability to graduate high school with academic support services, the ability to maintain long-term employment, and the ability to properly care for oneself.  Donnie does not possess any of these skills.  He has never lived alone,

> It is imperative to assess the adaptive functioning skills of a mentally retarded or intellectually disabled individual for a more accurate understanding of the person's intellectual abilities
> - Dr. Rutter, Exhibit G; Dr. Schlessinger, Exhibit J

does not have the ability to live independently, and does not handle finances of any kind.

Donnie has also always struggled to maintain employment.  He truly relies and depends on his

mother on a daily basis.

> Donnie would not be able
> to live independently.  He
> has been unable to
> maintain employment,
> not due to his lack of
> desire or motivation, but
> due to not being able to
> perform minimal
> standards
> - Ms. Barletta, Exhibit F

Donnie was able to keep some steady employment at Lee's Feed only because it was a family-owned, local business where they understood Donnie's limitations and were able to provide intense supervision as a personal favor to Donnie's father.  He was ultimately fired

> Donnie is at risk of having
> others respond to him
> negatively due to his at
> times making comments
> that are not socially
> appropriate with his intent
> being simply to be friendly.
> - Ms. Barletta, Exhibit I

for making a rude joke to a customer in an effort to make his co-workers laugh.

Although Donnie reports relationships with girlfriends, he is vague with the details.  Donnie's mother clarifies that the relationships are with women that are also intellectually disabled like Donnie and are very superficial in nature.  Lastly, it is clear from a review of the school records that Donnie was socially promoted from elementary school through high school.  He consistently received minimal passing grades that were sometimes due to uncharacteristically high scores on final exams after receiving failing grades the preceding marking periods.

Dr. Rutter further explains that Donnie, like all people, has strengths as well as deficits. However, his relative strengths exist within a context of important weaknesses; these weaknesses are less likely to be apparent when tasks are simple and discrete, highly structured, and provide immediate corrective feedback.  Donnie tries to conceal his deficits with short replies and glibness.  Dr. Schlessinger, indeed, noted that Donnie attempted to appear more psychologically stable than he actually is throughout her evaluation.  It is only when asked to expand on his answers, that someone interacting with Donnie is likely to find deficits.

As a result, people that have interacted the most with Donnie are more able to observe his significant intellectual limitations.  For example, in addition to his aunt who refers to him as a "kid," Lafayette Town Justice and Gardner family attorney, Maureen Perrin, who has known Donnie for over 20 years, describes him as childlike.



*Donnie's room has barely changed in 25 years*

*To the left is Donnie's prized drum set*



*To the right is Donnie's desk*

In fact, not much of Donnie's personal life has changed since he graduated high school over 25 years ago.  He still lives with his mother, in the same bedroom that is decorated relatively the same; he still has no true friends aside from his brother Doug; he still spends most of his time working on the family farm; his only great pleasure is playing in a country band with his mother.

It follows that examiners that spent the most time with Donnie and fully examined all collateral information are more able to decipher his true intellectual limitations.

> Donnie is an extremely concrete thinker with limited cognitive and intellectual ability
> - Ms. Barletta, Exhibit F

The examiner that spent the most time with Donnie is Cindy Barletta, LMSW.  As part of his pre-trial conditions, Donnie was required to attend counseling services regarding his sexually offending behavior at NuStep Counseling in Syracuse, New York.  He was active and compliant and attended weekly sessions with Ms. Barletta until his detention on a bail violation.

Ms. Barletta describes Donnie as a concrete thinker with limited cognitive intellectual ability, who is not able to make well thought out decisions independently, problem solve, or consider consequences.  According to Ms. Barletta, Donnie does not think before he speaks or process social cues.  On the surface, he is able to answer certain routine questions in what appears to be an insightful manner.  However, as treatment progressed, it became increasingly evident to Ms. Barletta that Donnie was merely repeating answers or comments that he has heard from his mother or others without the understanding or insight to understand the context and/or relevancy.  Regarding his criminal case, Donnie is unable to explain in any depth what is taking place regarding his charges.  Ms. Barletta further observes that Donnie demonstrates incongruent affect when discussing his case, always smiling and without apparent anxiety.  This Court observed these symptoms firsthand during the plea colloquy.

Certainly, regardless of any outward expression, Donnie is truly remorseful for his conduct.  Through pretrial counseling, Donnie has realized how wrong it was to communicate with a minor and ask for pictures.  Donnie knows what he did was wrong and immediately accepted responsibility for his actions and has maintained that acceptance.  And the sadness he feels daily from not being at his mother's side due to his wrongful conduct is immeasurable.

# Will Donnie do this again?

The answer is no.  Dr. Rutter performed a risk assessment of Donnie that revealed he does not exhibit symptoms consistent with Pedophilic Disorder and that his risk of recidivism is determined to be low.  Ms. Barletta similarly determined Mr. Gardner to be a low risk of committing a contact offense.  Dr. Rutter and Ms. Barletta found that Donnie does not present with Antisocial Personality Disorder or as a predator.

> Donnie's recidivism risk is determined to be low
> - Dr. Rutter, Exhibit G

Dr. Rutter and Ms. Barletta believe that Donnie would derive the most benefit from sexual offense specific education focused programs to teach him what socially acceptable sexual behavior is (and what is not).  Both believe he can appropriately be monitored in his home in the community.

> Donnie is low risk to the community regarding contact offenses
> - Ms. Barletta, Exhibit I

Similarly, Dr. Schlessinger found that Donnie may benefit from cognitive remediation training, psychoeducation utilized to target specific deficits, or accommodations in settings where he is required to learn new material.  He is capable of learning and benefitting from accommodation strategies.  She also noted that Donnie's time at NuStep Counseling was his first experience with mental health counseling and that Donnie enjoyed it.

Additionally, Donnie has demonstrated that when he understands clear directives by authority, he complies one hundred percent.  Ms. Barletta said as much in her

> Donnie is not a danger to himself or others
> - Dr. Rutter, Exhibit G

treatment summary: Donnie does what people in authority tell him to do.  For example, while on pretrial supervision, he was explicitly directed to not access the internet.  Despite several opportunities to do so, Donnie followed that directive and did not access the internet.

> Evidence shows that, not only were no inappropriate images found on Donnie's approved internet-capable devices, but Donnie did not even access the internet in accordance with the directives of Probation

In February 2016, he was found in possession of a hand held video game system that was capable of accessing the internet.  The game system belonged to his girlfriend at the time.  Probation seized the device and examined it.  Not only were no inappropriate images found on the device, but also the internet browser had not even been used.  Again, in October 2016 and December 2016, when Donnie accidentally text messaged Probation explicit messages instead of his

> Donnie does what his mother or people in authority tell him to do, without question.
> - Ms. Barletta, Exhibit F

girlfriend, Probation and a Cyber-Crime Specialist inspected his cell phone during surprise home visits. And again, not only were no inappropriate images found on the device, but Donnie did not even access the internet.

After sixteen months on pretrial supervision, a violation was filed when Donnie stopped at Guitar Center and Ollie's Bargain Outlet after a job interview at a McDonald's restaurant in the same plaza.  The job interview was sanctioned by Probation, but the stops at the other stores were not.  When Donnie arrived early at McDonald's, the manager asked him to return a little later.  Donnie then purchased a drink at Ollie's and browsed drum sets at Guitar Center, before returning to McDonald's to complete paperwork.  This resulted in Donnie being out later than his curfew.  Donnie's mother believes that he did not fully

> Donnie can be appropriately monitored in his home in the community
> - Ms. Barletta, Exhibit I;
> Dr. Rutter, Exhibit G

understand that the time extension approved by Probation to attend the job interview still meant he could not "stick around" as the McDonald's manager requested without first checking in with Probation.

Donnie repeatedly tells his mother that, upon his release, he does not even want to leave her property.  There is no question that Donnie can follow concrete directions of Probation and his mother.  He has clearly demonstrated that in numerous ways in the sixteen months on pretrial supervision, including not even accessing -- let alone doing something inappropriate -- the internet from his internet-capable devices.  Dr. Rutter, Dr. Schlessinger, and Ms. Barletta unequivocally opine that Donnie will benefit from various treatment programs, such as the program at NuStep Counseling, which he attended regularly.  Further, Dr. Rutter and Ms. Barletta explicitly opine that Donnie can be properly and effectively monitored in the community; Dr. Schlessinger does not give an opinion on that, as she was not tasked to do so. The basis of Dr. Rutter's and Ms. Barletta's opinion is grounded in their founded belief that Donnie is not a pedophile, he is not a predator, and is a very low risk of either re-offending and/or committing a contact offense.

# What is the appropriate sentence?

The defense respectfully submits that a 24-month sentence is appropriate in this case. Ultimately, this Court must "make an individualized assessment based on the facts presented" and has great discretion in formulating a sentence that is "sufficient, but not greater than necessary to accomplish the goals of sentencing." *Gall v. United States*, 552 U.S. 38, 49-51 (2007); *Kimbrough v. United States*, 552 U.S. 85, 101 (2007); *United States v. Williams*, 475 F.3d 468, 476 (2d Cir. 2007). When fashioning an appropriate sentence, the Court must consider all of the factors set forth in 18 U.S.C. § 3553(a): (1) the nature and circumstances of the offense; (2) the history and characteristics of the defendant; (3) the need for the sentence imposed to reflect the seriousness of the offense, afford adequate deterrence to criminal conduct, protect the public from further crimes of the defendant, and provide the defendant with needed rehabilitative or other treatment; (4) the Sentencing Guidelines and the sentencing range they provide; (5) the need to avoid unwarranted disparities in sentencing; and (6) the need to provide restitution to victims of the offense.

The advisory Sentencing Guidelines range here is 120 months. However, that number is artificially inflated. Today's child pornography guidelines include numerous possible enhancements that were presumably intended to increase the sentences for the most egregious offenders. In reality, however, these guidelines do little to differentiate the degree of culpability among offenders because essentially all of the enhancements apply in most every case. In *United States v. Dorvee*, the Second Circuit rejected a Sentencing Guidelines range for a first-time offender on the grounds that the child pornography guidelines were "fundamentally incompatible with §3553(a)." 616 F.3d 174, 187 (2d Cir. 2010). The Court specifically noted

that the Sentencing Guidelines enhancements result in a recommended sentence "near or exceeding the statutory maximum, even in run-of-the-mill cases." *Id*. at 186.

Consequently, the Court made clear that district court judges "may vary from the Guidelines range based solely on a policy disagreement with the Guidelines." *Id*. at 188 (quoting *United States v. Cavera*, 550 F.3d 180, 191 (2d Cir. 2008)).  Moreover, "judges are encouraged to take seriously the broad discretion they possess in fashioning sentences under §2G2.2 -- ones that can range from non-custodial sentences to the statutory maximum -- bearing in mind that they are dealing with an eccentric Guideline of highly unusual provenance which, unless carefully applied, can easily generate unreasonable results." *Id*.

Courts in this District have exercised their broad discretion and have sentenced defendants with similar charges to Donnie -- but with far more egregious facts, including sexual contact and statutory rape -- to below-Guidelines sentences:

| Case | Description of Offense | Guidelines | Sentence |
|---|---|---|---|
| *United States v. Faycal Taouzinet* 16-CR-6021 | The defendant engaged in sexually explicit chats with a minor less than 14 years of age for several months and persuaded the minor to engage in sexual intercourse with him.<br><br>The defendant further induced the minor to send at least one sexually explicit image to him. | 168 to 210 months | 60 months |
| *United States v. Joseph Kurowski* 16-CR-94 | The defendant communicated with a 17-year-old minor for several months.<br><br>The defendant further requested and received a sexually explicit photograph from the minor. | 70 to 87 months | 30 months |
| *United States v. Mohamad Nazir Ahmad* 11-CR-6130 | The defendant produced videos that depicted him engaging in sexually explicit conduct with a 13-year-old minor, a relative by marriage who was in the custody and control of the defendant. | 120 months | 36 months[1] |
| | | | |
| *United States v. Donald Gardner, Jr.* 15-CR-179 | Donnie communicated with a 10-year-old minor for less than one day, and requested and received three sexually explicit images from the minor in a 10-minute span. | 120 months | ? |

---

[1]  The 36-month sentence was to run consecutive to a five (5) year New York State sentence. The defendant ultimately served less than 33 months on the State sentence.

The foregoing emphasizes that the Sentencing Guidelines range is merely one of the factors set forth in 18 U.S.C. § 3553(a).  *See generally Rita v. United States*, 551 U.S. 338 (2007).

A lengthy sentence in this case will also have a disparate impact on Donnie.  Generally, inmates convicted of child pornography offenses face a particularly difficult time in prison. Those convicted of child pornography charges are on the bottom rung in the hierarchy of prison inmates.  Harassment comes not only from fellow inmates, but from the guards themselves.  An article in the Associated Press, dated February 16, 2014, entitled *Many Sex Offenders Killed in California Prison*, chronicled the increased percentage of homicide victims who are convicted sex offenders.  Male sex offenders make up 15% of the California prison population, but are almost 30% of the homicide victims.  Many of these homicides occurred while the sex offender was segregated in the special housing unit (SHU).

Donnie is especially vulnerable because of his intellectual disability.  He will not have his mother to help him.  He will be expected to work, when he has never been able to hold down a job.  The two cardinal rules of life in prison are: do not trust anyone and keep your mouth shut. Unfortunately, Donnie trusts everyone and talks incessantly.  As Ms. Barletta, Dr. Rutter, Dr. Schlessinger, and those close to him note, Donnie lacks social boundaries and a social filter, wants to be liked by everyone and aims to please.  These traits will undoubtedly cause Donnie to be easily targeted and victimized in prison.  Donnie's mother said as much to Dr. Rutter: she perceives him as very gullible and easily exploitable by others taking advantage of his naiveté, generosity, and desire to be liked.

Additionally, Donnie will be supervised by Federal Probation for at least five years and up to life as determined by Your Honor.  He will be required to comply with a myriad of

conditions.  These conditions will typically include psycho-sexual assessments and treatment, limitations on the use of computers and the internet, electronic monitoring, and limitations being in the presence of children without supervision. Donnie will be able to attend all the programs suggested by Ms. Barletta, Dr. Rutter, and Dr. Schlessinger.  Again, Ms. Barletta and Dr. Rutter both opined that Donnie could be appropriately monitored in the community.

Donnie will also be required to register as a sex offender pursuant to the Sex Offender Registration Act, a.k.a., Megan's Law.  His responsibilities as a registered sex offender will require him to report to his local law enforcement agency annually for a number of years, depending upon his classification.  Donnie will have to provide his residential address, telephone numbers, email address, employment, schooling, automobile, and possession of any professional licenses.  A sex offender registry with a photograph of Donnie along with his date of birth, his height, weight, hair and, eye color will be made available to the public via the internet.  The sex offender registry will also include information about the car Donnie drives, including its make, year and license number.  Anyone with access to a computer, be it a potential employer, a neighbor or a girlfriend can view this information.  Donnie's life is changed forever.

# CONCLUSION

Donnie is a 42-year old mentally retarded man with no criminal history whatsoever.  The duration of the core criminal conduct here was 10 minutes long, through Facebook communications without a suggestion of physical contact with Victim nor targeting of minor victims.  Agents seized and searched a Dell computer, two LG cell phones, an SCH cell phone, and an iPod from Donnie yielding no additional child pornography.  These facts confirm Dr. Rutter's diagnosis that Donnie is not a pedophile and both Dr. Rutter's and Ms. Barletta's opinion that the conduct here is an isolated incident that will never repeat itself.

Due to Donnie's significant intellectual limitations, the extremely uncharacteristic and isolated nature of his criminal conduct, and his low risk for a contact offense and/or repeating the instant offense, a 24-month sentence followed by extended supervision with any and all conditions this Court deem appropriate will serve the purposes of sentencing.

**DATED:**        July 6, 2018
                  Buffalo, New York

Respectfully submitted,

**/s/Frank R. Passafiume**
Frank R. Passafiume
Assistant Federal Public Defender
Federal Public Defender's Office
300 Pearl Street, Suite 200
Buffalo, New York 14202
(716) 551-3341; 551-3346 (fax)
frank.passafiume@fd.org
*Attorney for Donald Gardner, Jr.*