IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

               v.                                 15-CR-179

DONALD GARDNER, JR.,

                      Defendant.
_____

## THE GOVERNMENT'S RESPONSE TO THE DEFENDANT'S SENTENCING MEMORANDUM

**THE UNITED STATES OF AMERICA**, through its attorneys, James P. Kennedy, Jr., United States Attorney for the Western District of New York, Douglas A. Penrose, Assistant United States Attorney, of counsel, respectfully files this response in opposition to the defendant's Sentencing Memorandum and in support of a sentence of imprisonment of 120 months.

## PRELIMINARY STATEMENT

The defendant, DONALD GARDNER, JR., was charged in a multi-count Indictment with production of child pornography, in violation of 18 U.S.C. §§ 2251(a) and (e) (Counts 1, 2, and 3), receipt of child pornography, in violation of 18 U.S.C. §§ 2252A(a)(2)(A) and (b)(1) (Count 4), and possession of child pornography, in violation of 18 U.S.C. §§ 2252A(a)(5)(B) and (b)(2) (Count 5).   If convicted of production of child pornography, the defendant would have faced a mandatory minimum sentence of 15 years in prison.

On February 15, 2018, the defendant appeared before this Court and pled guilty to a one-count Superseding Information, charging violation of 18 U.S.C. §§ 2252A(a)(5)(B) and 2252A(b)(2) (possession of child pornography).   The Presentence Report ("PSR"), consistent with the plea agreement, determined that the defendant, with a total adjusted combined offense level of 35 and criminal history category of I, faces a guidelines range of 120 months, taking into account the maximum statutory penalty.   PSR dated April 3, 2018, Docket Item 64, at ¶ 59.   Both Gardner and the government filed sentencing statements, adopting the findings of the Presentence Report with respect to the sentencing factors therein. Docket Items 63, 72.

The plea agreement executed by the parties allowed the defendant to request a non-guideline sentence and the defendant has filed a sentencing memorandum requesting a non-guideline sentence of 24-months imprisonment.   Plea Agreement dated Feb. 15, 2018 at ¶ 16 (Docket Item 59); Defendant's Sentencing Memorandum dated July 6, 2018 at 1 (Docket Item 74).   This memorandum is submitted in opposition to defendant's request for a non-guideline sentence and in support of the government's contention that this Court should impose a guideline sentence of 120 months imprisonment.

**STATEMENT OF FACTS**

The government concurs with and relies on the statement of facts outlined in the PSR at paragraphs 14 through 32.

## DISCUSSION

I.    **In Considering the § 3553(a) Factors, the Court Should Conclude That a Sentence of 120 Months Provides the Proper Punishment for the Offense of Conviction.**

The United States recognizes that since *United States v. Booker*, 543 U.S. 220 (2005), the sentencing guidelines are advisory rather than statutorily mandated.   When imposing a sentence, the Court is required to consider the guidelines, but must fashion a sentence that is consistent with the factors detailed in 18 U.S.C. § 3553(a).   The United States contends the sentence of 120 months, which is the advisory guidelines sentence, is reasonable and appropriate in light of the factors set forth in 18 U.S.C. § 3553(a).

Under Section 3553(a), the sentence imposed must reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, and protect the public.   *See United States v. Rattoballi*, 452 F.3d 127, 133 (2d Cir. 2006) ("In calibrating our review for reasonableness, we will continue to seek guidance from the considered judgment of the Sentencing Commission as expressed in the Sentencing Guidelines and authorized by Congress . . . . It bears noting that the Sentencing Commission is an expert agency whose statutory charge mirrors the § 3553(a) factors that the district courts are required to consider") *abrogation on other grounds recognized by United States v. Cavera*, 550 F.3d 180 (2d Cir. 2008) (en banc).   The sentencing court must also consider "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct."   18 U.S.C. § 3553(a)(6).   A court that imposes a sentence outside the applicable advisory guidelines range must do so on notice to the parties

3

and must state "with specificity" both at sentencing and in the written judgment and commitment order its reasons for doing so.   18 U.S.C. § 3553(c).

While the defendant now requests a non-guideline sentence of 24 months, the government objects to such a sentence as unreasonable given the § 3553(a) factors, as set forth below.

A.   The Nature and Circumstances of the Offense Warrant a Sentence Consistent with the Sentencing Guidelines.

The defense spends little time—about four sentences of its 21-page submission—discussing the defendant's actions that gave rise to his guilty plea in this case.   But a more complete account of the facts makes clear that the defendant engaged in purposeful, deceitful, unrelenting, and exploitive conduct that resulted in the victimizing of a ten-year-old girl.   As such, a sentence of 120 months incarceration is warranted.

Contrary to the defendant's assertion, the "core conduct" did not take place over a 10-minute span.   Sentencing Memorandum at 8.   This may have been the timespan during which the victim sent the defendant explicit photographs of herself constituting child pornography, but the victim did not decide to accede to the defendant's demands for such photographs out of the blue.   Rather, the defendant had already laid careful groundwork for his crime.   First, he created a Facebook page wherein he used a picture of a young boy as his profile picture,[1] with the obvious intention of making it appear as if he was the young boy.

---

[1]      A "profile picture" is the primary picture associated with an individual's Facebook account, is the picture that is displayed when a search is run for someone's Facebook page, and is typically a picture of the person whose Facebook account it is.

The defendant initially explained that he had not purposefully made this his profile picture, but instead had "liked" the image and it somehow then became his profile picture on his Facebook page.[2]   PSR ¶ 30.   Defense counsel also claims that there were other pictures on the defendant's Facebook page that actually were of him, implying that it somehow should have been clear to the victim that the defendant was not the young boy portrayed in his profile picture, but rather the 42-year-old man that he actually was.   Sentencing Memorandum at 8.   However, the fact of the matter is that the defendant admitted that he knew the victim believed him to be the child depicted in his profile picture.   Statement of Defendant dated Oct. 23, 2014 (attached as Exhibit A).

Second, and more importantly, the defendant repeatedly lied about his age to the victim:

| | |
|---|---|
| Victim: | Your 14 im 10 |
| Gardner: | That ok |
| . . . . | |
| Victim: | Thanks u are 20 or 14[?] |
| Gardner: | 14 |
| Gardner: | Truth |
| . . . . | |
| Victim: | Cause u are a wierd [sic] 49 year old |
| Gardner: | I'm only 14 |
| Victim: | No u are nit [sic] |
| Gardner: | Yes I am |
| Gardner: | I'm 14 |

---

[2]       The Defendant asks the Court to believe that he is not knowledgeable about Facebook, PSR ¶ 37, but at the same time states that he believed the victim might have been older than her stated age of ten because ten-year-olds are not supposed to use Facebook, thereby demonstrating familiarity with Facebook's Terms of Service.   Statement of Defendant dated Oct. 23, 2014 (attached as Exhibit A)

Facebook Communications between Defendant and Victim dated Feb. 2, 2016 at 00014, 00021, 00038 (attached as Exhibit B).[3]   These explicit lies, coupled with the misleading profile picture, make plain the defendant's intent to deceive the victim about his age.

Third, the defendant refused repeated requests by the victim to speak on the phone. Of course, if the victim had spoken to the defendant, she quickly would have realized that she was communicating not with a 14-year-old boy, but instead with a 42-year-old man.   He therefore refused to call the victim, even though she made repeated requests, and did not answer the phone when she attempted to call him.   PSR ¶ 31.   Again, the chats make this clear:

| | |
|---|---|
| Gardner: | We can talk on phone later |
| . . . . | |
| Victim: | Answer me bitch |
| Gardner: | Talk on phone later |
| . . . . | |
| Gardner: | Talk on phone later promises |
| Victim: | U always say that and y never do |
| . . . . | |
| Victim: | no then answer my call |
| Gardner: | In alittle ok |
| Victim: | no answer it now or I am never talking to u again\ |
| Gardner: | I promise in one hour ok |
| Victim: | no u don't answer it now |
| . . . . | |
| Gardner: | I will answer if u send me pic or ur pussy open so I see pussy hole |
| Victim: | NO U WONT |
| Gardner: | I will |
| Gardner: | Send pic I will answer ur call |
| Victim: | Ni u wont |
| Gardner: | Yes I will |
| Victim: | No |
| Gardner: | Please |
| Victim: | No |

---

[3]       Page references are to the Bates numbers in the lower-right hand corner.

*Id.* at 00012, 00022, 00037, 00039-41.   All of this deceitful conduct allowed the defendant to pursue his objective:   convincing the victim, who he knew to be only ten years old, to send him sexually explicit pictures.   We don't have the benefit of being able to review all the chats between the victim and the defendant,[4] but what we do have shows that the defendant's requests were lewd, extremely specific, and unrelenting.   The requests quickly escalate from the defendant asking what the victim is wearing, to asking to see her feet, to much more graphic requests:

```
Gardner:       Can u show mo ur asshole
Victim:        No
Gardner:       Please
Victim:        Why
Gardner:       Like to
Victim:        Your 14 I'm 10
Gardner:       That ok
Gardner:       U care on age
. . . .
[First picture sent showing victim naked from the waist down, bent over, facing away
from the camera displaying her buttocks and vagina]
. . . .
Gardner:       Open ur ass cheeks take pic
. . . .
[Second picture sent showing victim naked from the waist down, bending over the
bath tub with her legs spread apart, displaying her buttocks and her vagina]
Gardner:       Ur sexy
Gardner:       Get hair brush
Victim:        No
Gardner:       Please
Victim:        I am not sticking it up my pussie
Victim:        Do u want a pic of my pussie open
. . . .
Gardner:       Yes
Victim:        kk
```

---

[4]       Because the defendant's Facebook account was disabled, a complete record of the conversation is no longer available.   Defense would have the Court infer that the account was disabled by Facebook and not by the defendant.   Sentencing Memorandum at 8.   Although there is no proof that the account was disabled by the defendant, it would have been quite a coincidence if Facebook happened to disable the defendant's account about a month after the offense conduct.   While this theory is possible, it is also possible—and more likely—that an individual who created a misleading Facebook profile and repeatedly lied about his age would later attempt to delete evidence of his crime.

Gardner:        So I can see in side pussy
. . . .
[Third picture sent showing close up image of victim's vagina with victim using her fingers to open up her vagina]
Gardner:        Hot
Gardner:        U a Virgin[]
Victim:          Yes
Victim:          I'm ten dude
Gardner:        Cool
. . . .
Gardner:        Can I see ur legs spread
Victim:          No
Gardner:        Please
Victim:          No
Gardner:        Why I want to see it
Victim:          Fine in a min
Gardner:        U send pic

*Id.* at 00010-22.   The victim then sends a picture of herself topless as well as other sexually suggestive pictures.   *Id.* at 00024-28.   The defendant asks what underwear the victim is wearing and asks her to get a pair of her sister's underwear.   *Id.* at 00032-34.   The defendant incredulously claims that all of this conduct, all of his demands, occurred because he was simply "curious."   PSR ¶ 37.   But these are not the actions of someone who is "curious."   These are the actions of someone who knew exactly what he wanted—sexually explicit pictures of a ten-year-old girl—and pursued it aggressively.   The seriousness of this conduct therefore weighs in favor of a significant custodial sentence for the purposes of punishment and promoting deterrence.   18 U.S.C. § 3553(a).


B.   <u>The History and Characteristics of the Defendant Warrant a Substantial Term of Incarceration.</u>

In his Sentencing Memorandum, the defendant presents himself as a "mentally retarded 42-year old man" whose criminal conduct was "uncharacteristic and isolated" and

who "does what people in authority tell him to do."   Sentencing Memorandum at 1, 15. The defendant certainly has cognitive limitations, but this did not prevent him from committing the crime for which he is to be sentenced and does not support a below-guideline sentence.   Of greater relevance than the defendant's limitations are his attempted exploitation of two other minor victims and his failure to abide by the terms of his pretrial release conditions, both of which further support a guideline sentence of 120 months incarceration.   Such a term of incarceration will not have a disparate impact on the defendant.

     1.  The Defendant's Attempts to Solicit Nude Photographs From Other Minor Victims Show That This Was Not an Isolated Incident.

Against the backdrop of the conduct that led to the defendant's guilty plea, there is also his Facebook communications with two other ten-year-old females.   As with the victim discussed above, we do not have the benefit of being able to review the complete Facebook chats with these girls, but they likewise believed that the defendant was only fourteen years old.   PSR ¶ 17.   And, as above, the defendant repeatedly asked the girls to send him nude pictures.   *Id.*   Fortunately, these chats did not lead to the girls sending the defendant any photos, but that was clearly the defendant's aim and it is not hard to imagine that there could have been more victims.   For present purposes, however, this demonstrates that the conduct for which the defendant has pled guilty was not in fact "isolated" at all.

2.   The Defendant's Behavior During Pretrial Release Demonstrates that a Substantial Term of Incarceration Is Appropriate.

Although the defendant has a minimal criminal history,[5] he stands before this Court not only to be sentenced for his solicitation of sexually-explicit pictures from a ten-year-old girl, but also having had his pretrial release revoked after repeated violations of his release conditions.   In December 2015, two months after he was released on an appearance bond, the defendant was terminated from his employment for making inappropriate comments to customers.   PSR ¶ 8; Order Setting Conditions of Release dated Oct. 14, 2015 at 2 (Docket Item 5) (setting continued employment as a condition of release).   Two months later, in February 2016, the defendant was found in possession of an internet-capable device, again violating his release conditions.   PSR ¶ 9; Release Conditions at 3.

On October 3, 2016, the defendant mistakenly sent his supervising officer a text message stating, "If we fuck u want me to wear a condum [sic]."   PSR ¶ 10.   A subsequent search of the defendant's phone revealed numerous "sexting" communications with the defendant's girlfriend.   *Id.*   The defendant was warned that this was considered "high risk" behavior and advised to discuss it with his therapist.   *Id.*   Despite this warning, on December 23, 2016, the defendant again mistakenly texted his supervising officer, this time asking, "What u wearing."   *Id.* at ¶ 11.   As before, a subsequent search of the defendant's phone indicated numerous sexting communications with a female.   *Id.*   While these communications were between two adults, both the supervising officer and the defendant's therapist concurred that although perhaps not a violation of the defendant's release

---

[5]      In 2013, the defendant was arrested and charged with Petit Larceny, a Class A misdemeanor, in relation to a stolen iPhone, but the records regarding the disposition of this matter are sealed.   PSR ¶ 57.

conditions, they were "clearly high risk behaviors."   *Id.*   And as with his communications with the victim in this case, it was the defendant who was the pursuer of furthering the explicit discussions.   *Id.*

Finally, on December 19, 2017, the defendant engaged in the conduct that led to the revocation of his bail.   The defendant had been given permission to attend a job interview at a McDonald's restaurant, which was to take place after his Court-approved curfew.   PSR ¶ 12.   The defendant arrived at the location for his interview, but then proceeded to two other nearby locations, a Guitar Center and Ollie's Bargain Outlet.   *Id.*   When questioned, the defendant explained that the manager at the McDonald's had advised that he might need to return to fill out paperwork, but the defendant admitted that he should have informed his supervising officer of the possible change in schedule.   *Id.*

According to the defense, the defendant "does what people in authority tell him to do," highlighting the fact that he did not access the internet despite several opportunities to do so, but glossing over the fact that the defendant only had the opportunity to access the internet because he directly violated one of his release conditions, *i.e.*, "possessing any device[] with internet access, including devices such as but not limited to game systems." Sentencing Memorandum at 14; Release Conditions at 3.   The defendant's mother likewise excuses his violations, believing that the defendant did not understand that the permission he received to attend the McDonald's interview did not extend to his excursions to the Guitar Center and Ollie's Bargain Outlet.   Sentencing Memorandum at 15.   But this explanation is belied by the defendant's own words.   The defendant admitted that he knew he should not

11

have gone to the other locations, "but gave into himself."   Violation Report dated Feb. 9, 2017 at 2 (attached as Exhibit C).   The defense asserts that "[t]here is no question that [the defendant] can follow concrete directions of Probation."   Sentencing Memorandum at 16. If the defendant is in fact able to follow the directions of Probation, which he clearly understood, the question becomes why did he choose not to?   And why would his conduct be any better on supervised release than it was on pretrial release?


   3.   The Defendant's Mental Limitations Do Not Justify a Below-Guideline Sentence.

   The defendant's words and actions, not the various character letters or psychological evaluations, show his true character.   And although the defendant certainly has mental cognition limitations, this has not stopped him from committing the instant offense.   An offense that involved creating a misleading Facebook page, convincing his victim that he was a fourteen-year-old boy, and persuading her to send him sexually explicit pictures of herself. These were not the actions of someone who is "a good kid," Sentencing Memorandum at 2, and the various psychological evaluations of the defendant do not warrant a sentence of less than 120 months.


   The psychological evaluations performed on the defendant consistently diagnose him as having an "Intellectually Disability, Mild," "Intellectual Disability, mild severity," and "Borderline Intellectual Functioning."   Report of Michael E. Rutter, PhD., dated July 19, 2016 at 5 (attached as Exhibit G to Defendant's Sentencing Memorandum) [hereinafter "Rutter Report"]; Report of Ana Natasha Cervantes, M.D., and Melissa D. Heffler, M.D., dated Dec. 7, 2016 at 3 (attached as Exhibit H to Defendant's Sentencing Memorandum)

[hereinafter "Cervantes and Heffler Report"]; Report of Kari M. Schlessinger, Psy.D., Ph.D., dated April 14, 2017 at 10 (attached as Exhibit J to Defendant's Sentencing Memorandum) [hereinafter "Schlessinger Report"].   In reaching these diagnoses, the defendant was described by Dr. Rutter as having "consistently logical and goal-directed" conversation. Rutter Report at 3.   Dr. Cervantes and Dr. Heffler similarly commented that the defendant's speech was "spontaneous and fluent," and Dr. Schlessinger noted that the defendant's speech was "logical, coherent, and relevant."   Cervantes and Heffler Report at 2; Schlessinger Report at 10.   Indeed, the Court need only look at the defendant's statement to the FBI in relation to the instant offense, attached as Exhibit A, or his letter attached as Exhibit A to his Sentencing Memorandum.   Both demonstrate clear, logical, and coherent thought.

According to defense counsel, for individuals with the defendant's limitations, it is critical to assess the subject's "adaptive functioning skills."   Sentencing Memorandum at 10. Such skills include "adequate social functioning, romantic relationships, the ability to graduate high school with academic support services, the ability to maintain long-term employment, and the ability to properly care for oneself."   *Id.*   Remarkably, defense counsel asserts that the defendant possesses none of these skills.   *Id.*   This conclusion is contradicted by the facts and by the professionals who evaluated the defendant, including Dr. Cervantes and Dr. Heffler, who were retained by defense counsel.

With respect to social functioning and romantic relationships, the defendant has had several girlfriends.   Rutter Report at 4; PSR ¶¶ 76-78.   The defendant's mother states that these relationships were "very superficial in nature."   Sentencing Memorandum at 11.

However, according to the defendant, two of the relationship were "serious," and for one of these relationships he actually lived with his girlfriend in her home.   Schlessinger Report at 6.

The defendant's employment record is also fairly typical.   He was able to retain his most recent job, at Lee's Feed, for nearly 10 years, where he was described as a "good worker."   PSR ¶ 99; Rutter Report at 4.   His tenure at prior positions was admittedly shorter and some of these positions were clearly not a good fit for someone with the defendant's limitations, such as the position at FedEx, where he was let go for not being fast enough. Schlessinger Report at 5.   However, for many of these positions, it appears that the defendant left of his own volition in order to get more hours, get more pay, or find a job closer to home. Schlessinger Report at 5.   For example, the defendant worked at McDonald's for a year and a half prior to finding a job which paid more.   *Id.*   He then returned to McDonald's after other jobs didn't work out, and only left because he wanted a job with more hours.   *Id.*   The defendant left another job as a cleaner because it was too far from home.   *Id.*   He left two other jobs, one at Otisco Lake marina and one at Wegmans, so that he could seek full-time employment.   PSR ¶ 104, 105.   These may have been low-skilled positions, but it is inaccurate to claim that the defendant is unable to maintain long-term employment.

As Dr. Cervantes and Dr. Heffler point out, the defendant "was able to graduate high school with academic support services," thus showing adequate adaptive functioning skills in this area.   Cervantes and Heffler Report at 3.   It is not clear, as defense counsel claims without citation, that the defendant "was socially promoted from elementary school through

high school." Sentencing Memorandum at 11. His grades certainly were not good, and he received the benefit of an individual education program, but he was able to graduate from high school. Defense counsel claims that the defendant received "uncharacteristically high scores on final exams after receiving failing grades the preceding marking periods." *Id.* Review of the defendant's high school grades, however, shows that his grades were typically consistent across marking periods and final exams, and oftentimes the final exam grade was *lower* than what he had received during the preceding year. Sentencing Memorandum Exhibit E at 1-2.

Finally, the defendant has demonstrated a reasonable ability to properly care for himself. Indeed, he is able to care not only for himself but also to provide some amount of care for his elderly aunt. Cervantes and Heffler Report at 3. He was also capable of managing his personal care needs while at Metropolitan Correctional Center – New York, where he was placed in a typical housing unit. Schlessinger Report at 8.

In light of the above, it is not surprising that the professionals who evaluated the defendant concluded that "[o]verall, [the Defendant] demonstrates good adaptive functioning despite his IQ measures." Cervantes and Heffler Report at 3. Dr. Schlessinger similarly concluded that "[d]espite his intellectual limitations, [the defendant] exhibited adaptive functioning skills. He maintained adequate social functioning, as he reported relationships and the ability to maintain simple employment. Additionally, he did not display deficits in sociability on the unit or in his interactions with his evaluator." Schlessinger Report at 11. Defense counsel's claim to the contrary is simply unsupported and incorrect.

Defense counsel would have the Court ignore the conclusions reached by the professionals discussed above and instead rely the defendant's counselor, Cindy Barletta. Sentencing Memorandum at 12.[6]   According to the defense, because Ms. Barletta spent the most time with the defendant, her conclusions, as expressed in her less than two-page treatment summary, should be given the most weight.   *Id.*   First, some of her conclusions, *e.g.,* that the defendant "has been unable to maintain employment" or that he "does what his mother or people in authority tell him to do" are contradicted by the facts.   Treatment Summary of Cindy Barletta, LMSW, dated July 12, 2016 at 1-2 [hereinafter "Barletta Summary"].   Second, some of her other conclusions, such as her claim that the defendant "is unable to formulate pertinent questions to ask his attorney regarding his case or to advocate for himself" are contradicted by the other professionals that evaluated the defendant and provided much more thorough reports.   *Compare id.* at 1 *with* Cervantes and Heffler Report at 4-5 (stating that the defendant "appears more hesitant, rather than unable, to provide information to assist in his defense" and "demonstrated that he has the ability to cooperate with counsel and possesses the insight and capacity to aid in his own defense"); Schlessinger Report at 15 (stating that the defendant "has a rational and factual understanding of the proceedings against him and he is capable of assisting counsel with his defense").

Most importantly, however, Ms. Barletta's assessment was performed without "confirmation or details of the allegations of sexual offending behavior."   Barletta Summary at 1.   Without knowledge that the defendant set up a misleading Facebook profile, lied about

---

[6]      Defense counsel additionally asks the Court to consider the fact that two individuals—the defendant's aunt and a family friend—refer to the defendant as a "kid" or describe him as "childlike."   Sentencing Memorandum at 12.   One-word descriptions by two laypersons should be given little if any weight in assessing the defendant's adaptive functioning skills.

his age, refused to speak on the phone with the victim, and was thereby able to gain the trust

of a ten-year-old girl.    Without seeing his repeated, explicit demands for the victim to provide

him with child pornography.    This severely undercuts her conclusions regarding the

defendant's characteristics, particularly her claim that the defendant is "at low risk to be a risk

to others in the community."    *Id.*

> 4.  A Guideline Sentence of 120 Months in Prison Will Not Have a Disparate Impact
>     on the Defendant.

Contrary to defense counsel's argument, a term of incarceration will not have a

disparate impact on the defendant.    Any custody affects a defendant's family and in this way

the defendant is no different from countless others.    As the court in *United States v. Christman*

held, care of adult parents is not a reason to keep an offender out of prison.    607 F.3d 1110,

1120 (6th Cir. 2010); *see also* USSG § 5H1.6 ("[F]amily ties and responsibilities are not

ordinarily relevant in determining whether a departure may be warranted.")    Certainly the

fact that the defendant's current incarceration has caused the defendant's mother "to hire

people to fix her farm equipment and haul the hay bales" does not qualify as a disparate

impact.    Sentencing Memorandum at 4.    Nor do his mother's health problems or the fact

that his father has passed away.    *Id.* at 7.    This is true of any number of defendants and is

not an appropriate basis upon which to reduce a sentence.

Nor is there any merit to the defendant's argument that he will be abused in prison.

As support for this argument, the defendant cites a single news article about state prisons in

California.    Sentencing Memorandum at 19.    The relevance of this article to the defendant's

situation is questionable at best given that the defendant would be placed in a federal facility.

More importantly, however, the defendant has been incarcerated for over a year since his pretrial release was revoked, primarily at the Northeast Ohio Correctional Facility ("NEOCC").   During that time, he has not been involved in a single incident, nor has he complained about being harassed in any way.   The defendant also spent time at the Metropolitan Correction Center New York ("MCC-NY") where he was placed in a typical housing unit.   Schlessinger Report at 8.   According to Dr. Schlessinger's report, while at MCC-NY, the defendant was not a management problem, the staff reported that he was cooperative, he did not receive any disciplinary actions, and he was not cited in any incident reports.   *Id.*

Therefore, the characteristics of the defendant, as applied to this case, weigh in favor of a term of incarceration of 120 months.    18 U.S.C. § 3553(a)(1).

C.  <u>The Seriousness of the Offense, the Need to Promote Respect for the Law, and to Provide Just Punishment All Warrant a Sentence of 120 Months Incarceration.</u>

Congress understood that the children used in the production of child pornography were the "primary victims" when it passed legislation prohibiting the sexual abuse and exploitation of children through pornographic means. *United States v. Boos*, 127 F.3d 1207, 1210 (9th Cir. 1997).   Congress' legislative history for enacting child exploitation statutes "was born out of a 'deep and abiding concern for the health and welfare of the children and youth of the United States,' and was enacted in order 'to protect and benefit such children.'" *Id.* at 1211 (*citing* S. Rep. No. 95-438, at 40 (1977), *reprinted in* 1978 U.S.C.C.A.N. 40, 43).

The Senate Report specifically condemned what it saw as "base and sordid activities *which may permanently traumatize and warp the minds of the children involved*." *Id.* (emphasis added).   As the Supreme Court has stated, "[a] democratic society rests, for its continuance, upon the healthy, well-rounded growth of young people into full maturity as citizens." *New York v. Ferber* 458 U.S. 747, 757 (1982).   Therefore, the Supreme Court has declared that it "will generally sustain legislation aimed at protecting the physical and emotional well-being of children even when the laws . . . operate in sensitive areas." *Id.*   Additionally, the Supreme Court has acknowledged the compelling governmental interest in stamping out child pornography at all levels.   *Osborne v. Ohio*, 495 U.S. 103, 108-11 (1990).

In the Child Pornography Prevention Act of 1996 ("CPPA"), Congress recognized that the production of child pornography "is a form of sexual abuse which can result in physical or psychological harm, or both, to the children involved" since it creates a permanent record of the child's abuse, allowing for continued victimization of that child. S. Rep. 104-358 § 2 (1)(2) (1996).   Indeed, the Senate report found that the "sexualization of minors creates an unwholesome environment which affects the psychological, mental and emotional development of children and undermines the efforts of parents and families to encourage the sound mental, moral and emotional development of children."   S. Rep. No. 104-358, § 2 (11)(B).   The Senate therefore concluded that there is a "compelling governmental interest for prohibiting the production, distribution, sale, or viewing of visual depictions of children engaging in sexually explicit conduct."   S. Rep. No. 104-358, § 2 (13).

The "use of children as subjects of pornographic materials is harmful to the physiological, emotional, and mental health of the child" used in the production of the pornographic material.   *Osborne*, 495 U.S. at 109.   The Sixth Circuit has likewise held that using children to produce graphic sexual images is a form of sexual abuse which can cause mental and/or physical harm to a child.   *United States v. Champion*, 248 F.3d 502, 506 (6th Cir. 2001).   Unfortunately, "[t]he 'victimization' of the children involved does not end when the camera is put away."   *United States v. Norris*, 159 F.3d 926, 929 (5th Cir. 1998).

Therefore, just punishment for the defendant's conduct must account for the impact his conduct had on his victim, who will undoubtedly struggle with coming to terms with the defendant's conduct for years to come.   Therefore, under the principles of just punishment, a sentence of 120 months is appropriate.   18 U.S.C. § 3553(a)(2)(A).

D.   The Need to Afford Adequate Deterrence to Criminal Conduct Warrants a Sentence that Accords with the Guideline Range.

Child pornography is one of the most insidious traps confronting children in this country.   Both Congress and the United States Supreme Court have found that the prevention of sexual exploitation and abuse of children constitutes a government objective of surpassing importance because of the psychological and physical effects such abuse has on children and their families.

As justification for higher sentences in child pornography offenses, Congress stated:

> (2) The Government has a compelling state interest in protecting children from those who sexually exploit them, including both child molesters and child pornographers.   "The prevention of

sexual exploitation and abuse of children constitutes a government objective of surpassing importance, *New York v. Ferber*, 458 U.S. 747 (1982), and this interest extends to stamping out the vice of child pornography at all levels in the distribution chain." *Osborne v. Ohio*, 495 U.S. 103, 110 (1990).

(3) The government thus has a compelling interest in ensuring that the criminal prohibitions against child pornography remain enforceable and effective. "The most expeditious if not the only practical method of law enforcement may be to dry up the market for this material by imposing severe criminal penalties on persons selling, advertising, or otherwise promoting the product." *Citing Ferber*, 458 U.S. at 760.

The Protect Act, Title V. - Obscenity and Pornography, Sec. 501. Findings.  As stated by Congress, the government has a compelling interest to protect children from sexual predators. *Ferber*, 458 U.S. at 757. A solution in effectively combating the rising tide of the sexual exploitation of children is for legislatures to authorize penalties severe enough to sufficiently deter pornographers from ever beginning the practice of exploiting children for sexual purposes. "If we are to achieve progress in attacking the growing problem of child pornography and its resulting harms, we must be prepared to adapt our responses to meet this very real threat in a world of 'virtual realities.'" Brief of Amicus Curiae on Behalf of the National Center for Missing & Exploited Children at 15, *Ashcroft v. The Free Speech Coalition*, 122 S. Ct. 1389 (2001) (No. 00-795).


Deterring other individuals from producing and possessing images of the sexual exploitation of children is a critical issue for this Court to consider.  Therefore, the government submits that a guideline sentence of 120 months would provide adequate deterrence to the defendant and others who might engage in similar conduct.  18 U.S.C. § 3553(a)(2)(B)**.**

E.   A Guideline Sentence of 120 Months Is Not "Artificially Inflated" and Would Not Result in a Sentencing Disparity.

The defense argues that the guideline sentence of 120 months is "artificially inflated," citing *United States v. Dorvee*, 616 F.3d 174 (2d Cir. 2010), but *Dorvee* is inapposite.   The defendant in *Dorvee* pled guilty to one count of distribution of child pornography in violation of 18 U.S.C. § 2252A(a)(2)(A), which has a statutory maximum penalty of 240 months.   *Id.* at 175.   The guideline sentence was initially calculated at 262 to 327 months, including five separate enhancements that increased the offense level by 20, and was then reduced to 240 months to account for the statutory maximum.   *Id.* at 177-78.

Here, if anything, the guideline number is artificially *deflated* because the defendant was allowed to plead guilty to possession of child pornography not involving a prepubescent minor, which has a ten-year maximum sentence.   The facts of the case would have supported a guilty plea to either possession of child pornography involving a prepubescent minor or production of child pornography.   If so, the statutory maximum would have been 20 or 30 years in prison, respectively, and the guideline range would have been 168 to 210 months. PSR at ¶ 59.   Furthermore, and unlike in *Dorvee*, there were only two enhancements totaling six levels that were applied in this case.   *Id.*   Defendant's reliance on *Dorvee* is therefore misplaced.   *Dorvee* did instruct district courts that they "may not presume that a Guidelines sentence is reasonable for any particular defendant, and accordingly, must conduct its own independent review of the § 3553(a) sentencing factors."   *Id.* at 182.   The government has set forth information the government believes is relevant to sentencing in this action, and based on that information, submits that a sentence of 120 months is appropriate.

22

In arguing for a below-guideline sentence in this case, the defendant cherry-picks three unrelated cases that purportedly involved "far more egregious facts" where a court in this district imposed a below-guideline sentence.   Sentencing Memorandum at 18.   First and foremost, it is important to determine the appropriate sentence for *this* defendant, on *this* set of facts.   References to three unrelated cases are of limited utility and the government could just as easily provide a litany of cases where the defendant received a guideline sentence for conduct involving far less egregious facts.   Second, we do not have the benefit of all the information that the sentencing court had for each of these cases, such as the presentence investigation report, psychological evaluations, etc.   Trying to evaluate a sentencing decision without this information is a meaningless exercise.

Third, even a cursory review of these cases shows that there were factors not present in the instant case that may have influenced the court's decision to impose a below-guideline sentence.   In *United States v. Taouzinet*, 6:16-cr-06021, the defendant was in his 20s and believed the victim with whom he had been chatting online was 17.   Affidavit in Support of Criminal Complaint, dated June 30, 2015, at ¶ 12 (Docket Item 1).   In *United States v. Kurowski*, 1:16-cr-00094, the defendant was 22-years old at the time of the offense, which involved communicating with a 17-year old victim, and suffered from anxiety, depression, narcolepsy, and suicidal thoughts.   Plea Agreement, dated Nov. 30, 2016 at ¶ 8 (Docket Item 22); Defendant's Statement with Respect to Sentencing Factors, dated March 7, 2017, at 11-12 (Docket Item 32).   Finally, in *United States v. Ahmad*, 11-cr-06130, the federal sentence was imposed on top of a five-year state sentence for the same conduct, with the two sentences to run concurrently, and both the victim and the victim's family had forgiven and supported the

defendant.   Defendant's Sentencing Statement dated Nov. 12, 2012, at 2-3 (Docket Item 86). Trying to draw inferences from these cases does not assist the Court in determining the appropriate sentence for the defendant here.   Instead, for all the reasons outlined above, a guideline sentence of 120 months is appropriate.

## CONCLUSION

For the reasons set forth above, the government respectfully requests that the Court sentence the defendant to a term of imprisonment of 120 months.


DATED:   Buffalo, New York, July 25, 2018.

JAMES P. KENNEDY, JR.
United States Attorney


BY:   s/DOUGLAS A. PENROSE
Assistant United States Attorney
United States Attorney's Office
Western District of New York
138 Delaware Avenue
Buffalo, New York 14202
716-843-5868
Douglas.Penrose@usdoj.gov

TO:   Frank R. Passafiume, AFPD
United States Probation Department
Attn: Natalie B. Whitman, USPO