UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

      v.　　　　　　　　　　　　　　　**15-CR-179-FPG**

DONALD GARDNER, JR.**,**

      Defendant.
_____

**REPLY TO GOVERNMENT'S SENTENCING MEMORANDUM**

The government spends twenty-four pages twisting and manipulating facts to portray a borderline intellectual functioning man, suffering from genuine intellectual impairment, to be a calculating and conniving predator that fastidiously peruses Facebook Terms of Services in search of a victim, and who deserves a lengthy jail sentence. The plea agreement allows for a non-guidelines sentence. Due to Donald Gardner Jr.'s significant intellectual limitations, the extremely uncharacteristic and isolated nature of his criminal conduct, and his low risk for a contact offense and/or repeating the instant offense, a 24-month sentence followed by extended supervision with any and all conditions this Court deem appropriate is not only wholly appropriate, but it is just.

**I.**　　**Donnie Did Not Lay "Careful Groundwork for his Crime"**

The government misquotes Donnie's sentencing memorandum. Dkt. 77 at 4. There is no dispute that the "core offense conduct" here occurred during a 10-minute span -- the minor victim sent Donnie three images between 17:15 UTC and 17:25 UTC. As the plea agreement

clearly states, these facts form the basis for the entry of the plea of guilty, "including relevant conduct." Dkt. 59 at 4. There is no other crime or relevant conduct here.

The "careful groundwork" the government claims Donnie laid is nonexistent. Dkt. 77 at 4. According to the evidence, Donnie's Facebook profile image was uploaded on February 1, 2014. While it is true that it was the image of a child, it certainly does not support the "obvious intention" the government is attaching to it. *See* Dkt. 77 at 4-5. Defense forensic expert, Gerald Grant, with whom this Court is familiar, thoroughly examined the discovery in this case and indicated that Donnie was not specifically targeting underage girls with any of his communications. For example, there were no Facebook searches or chat groups associated with child pornography on Donnie's Facebook page. In fact, an examination of Donnie's entire Facebook page reveals conversations where Donnie tells another user that he works at Lee's Feed to confirm his identity. *See* Search Warrant Application at 16, ¶ 37.

Moreover, it is clear that Donnie did not have the wherewithal to intentionally create a Facebook profile of a young boy for the purpose of soliciting minors: his Facebook vanity name was his actual name -- donnie.gardner.965 -- and he left actual pictures of himself on his Facebook page. Indeed, the victim had an inkling that she was communicating with an adult, calling him a "wierd [sic] 49 year old." Dkt. 77 at 5-6. The government's claim that Donnie's picture requests were "unrelenting" and "pursued [] aggressively" are belied by the facts. The criminal conduct lasted 10 minutes and Donnie never threatened or coerced the victim into sending a picture. Dkt. 77 at 7, 8.

The government absurdly suggests that Donnie's refusal to call the victim on the phone is evidence of some level of sophistication. *See* Dkt. 77 at 6-7. In making this claim, the government fails to disclose that, again, the entire core criminal conduct took place over the

course of 10 minutes.  It is odd that the government cites Donnie's refusal to escalate the situation with the victim as more damning evidence.  The government's refusal to acknowledge the extremely short timeframe of the crime and the crucial fact that no child pornography was discovered on the Dell computer, two LG cell phones, an SCH cell phone, and an Ipod that were seized and searched by agents is of no surprise as it entirely undercuts the government's attempt to persuade the Court that Donnie "laid careful groundwork" for this offense.

Additionally, the government ludicrously suggests that part of Donnie's "careful groundwork" for this offense was his knowledge of the Facebook Terms of Service.  *See* Dkt. 77 at 5, n. 2.  Who among us has read the Terms of Service for any online service?  Certainly not a mentally retarded man like Donnie.  The so-called proof the government cites is an un-*Mirandized* statement written by agents for Donnie during the execution of a search warrant at Donnie's house in October 2014 -- approximately one year prior to his arrest -- that states that Donnie did not believe 10-year-olds could use Facebook.  By citing that, the government would have the Court believe that the Facebook Terms of Service state that 10-year-olds are not allowed to use Facebook.  That is simply inaccurate.  *See* https://www.facebook.com/help/157793540954833 (last accessed August 6, 2018) ("Facebook requires everyone to be at least 13 years old before they can create an account").  If the government did not know this, surely Donnie did not either.

## II.     The Lack of Additional Facebook Records Falls on the Government

The government absolves itself when it comes to its own shortcomings.  "We don't have the benefit of being able to review all the chats between the victim and the defendant" and "although there is no proof that [Donnie's Facebook] account was disabled by [Donnie], it would

3

have been quite a coincidence if Facebook happened to disable [Donnie's] account about a month after the offense conduct." Dkt. 77 at 7, n. 4.

Law enforcement subpoenaed the Facebook records. It is the government that communicated directly with Facebook. It is the government that can inquire with Facebook about who disabled the account, or seek and obtain the relevant records to make that determination. Our forensic expert, Mr. Grant, was unable to determine who disabled the account based on the records the government obtained and disclosed. The government chose to remain in the dark as to the facts, but now wants the Court to leap to presumptions at sentencing.

Donnie's Facebook account was disabled in March 2014 -- over a month after the offense conduct. At that point in time, the investigation into this case had just begun and there is no way that Donnie knew of the investigation. Again, Donnie did not know about the investigation until the execution of the search warrant in October 2014 so why would he disable his Facebook account in March 2014? What did happen in March 2014 was that the victim spoke with investigators and the Child Advocacy Center about the "donnie.gardner.965" Facebook profile. It makes more sense that law enforcement or the Child Advocacy Center contacted Facebook and Facebook thereafter disabled the account. The government failed to investigate and is now asking the Court to rely on wholly unsupported assumptions set forth in its sentencing memorandum.

### III.    Solicitations of Other Minors Did Not Occur

The government refers to Facebook communications with two other 10-year-old females, but blames the lack of Facebook records as a reason to not know of these solicitations. Dkt. 77 at 9. The statements referenced in the pre-sentence report that the government cites are

4

statements from classmates of the victim made to law enforcement during the investigation. *See* Dkt. 77 at 9 (citing PSR ¶ 17). These statements are unsupported by the Facebook records. The alleged solicitations of these minors would have occurred during the same timeframe as the solicitation of the victim. The government blames Donnie for the lack of records and wants the Court to infer that these records that the government did not obtain have incriminating evidence. Undoubtedly, if there was proof that Donnie solicited child pornography from other minors, he would have been charged with those crimes as well.

## IV.    Repeated Violations on Pretrial Release Did Not Occur

Donnie did not violate the continued employment condition. It is true that he was fired from his job at Lee's Feed. Donnie's been fired from many jobs due to being unable to meet minimum work standards, and Lee's Feed was no different. His tenure of over 10 years there did not last very long after Donnie's father was diagnosed with lung cancer and bedridden. It was Donnie's father that kept Donnie employed -- his father was a friend and frequent customer of the owner. After his termination, Donnie made arrangements with Probation that, while he looked for employment through Vocational and Education Services for Individuals with Disabilities (VESID), he would be able to help his mother around the farm. Probation never filed a violation when Donnie lost his job.

Nor did Donnie exchanging sexually explicit messages with another *adult* (and a couple accidentally with his Probation Officer) result in a violation of the conditions of his release. Upon investigation, the woman Donnie was communicating with was a peer in his VESID group and it was confirmed by Probation that she was a consenting participant. The government glosses over a subsequent unannounced visit, where Probation inspected Donnie's Probation-

approved phone. The inspection revealed that, although Donnie had access to the internet, he did not use it in careful compliance with that condition of release. The phone did not have child pornography, and had not even accessed the internet even though it was capable. Probation also found a portable video game system that had internet capabilities at Donnie's house, that a friend left by accident one night. Probation examined it and, again, found that the internet had not been accessed by Donnie.

These isolated incidents occurred during the over sixteen months Donnie was on pretrial supervision. Donnie's only violation -- which led to his bail revocation -- happened during a job interview. Donnie was allowed to go to an interview arranged by VESID at McDonald's. Donnie arrived at McDonald's, signed some paperwork, and was asked to return after the dinner rush to complete additional paperwork. Donnie failed to contact Probation with this slight change in plans, and to kill time, he stopped at Ollie's Bargain Outlet to buy a soda and then stopped at Guitar Center to check out some drums. A violation was filed for that excursion.

During the almost year and a half on pretrial supervision, Donnie regularly attended counseling sessions at NuStep Counseling Services, maintained excellent communication with defense counsel and Probation, did not view or obtain child pornography, and did not access the internet despite several opportunities to do so. Ignoring the latter is intentionally naive on the government's part.

## V.     Donnie is Mentally Retarded

The government has chosen to not speak to a single family member, employer, counselor, or therapist that knows or has observed Donnie. The government rejected the offer to speak with Donnie himself with his attorney present to observe Donnie's intellectual limitations firsthand.

The government chose not to retain its own expert.  In fact, the only time the government has uttered a word to any such individual was when it was contacted by the Bureau of Prisons in relation to the competency evaluation and then the government stated to Dr. Kari Schlessinger that "Mr. Gardner may be manipulative."  Dkt. 74, Exhibit J at 14.  This baseless accusation was rejected by Dr. Schlessinger in her report.  It is preposterous, insulting, and disingenuous that the government comments on Donnie's mental health without even making a minimal effort to examine his limitations firsthand.

     Now, in anticipation of sentencing years later, the government nitpicks tiny excerpts from the numerous mental health examinations to negate a lifelong, diagnosed intellectual disability.  *See* Dkt. 77 at 12-17.  This endeavor is misleading and contradicted by the records and findings of multiple mental health professionals.  For instance, the government goes out of its way to attack the credibility of Cindy Barletta -- the counselor that Donnie was *court-ordered* to see -- claiming that she was kept in the dark and really did not know what was going on.  *See* Dkt. 77 at 16-17.  On the contrary, Ms. Barletta had in-depth knowledge of all the facts and circumstances.  She remained in constant communication with Donnie's pretrial Probation Officer, saw Donnie on a regular basis, was consulted for Donnie's pretrial violation, spoke to defense counsel and discussed the indictment and plea agreement, and was even sent a copy of the indictment for her review.  It is obvious that the government specifically targets Ms. Barletta as she works with people like Donnie all the time, who are referred to her by the court, and she considers Donnie to not be a danger to the community, but appropriate for treatment while in the community.

     The government cites Donnie's letter remembering his father to "demonstrate clear, logical, and coherent thought" in an attempt to minimize the severity of his mental limitations.

7

Dkt. 77 at 13.  Really?  Read the first few lines of Donnie's letter: "This is how I remember dad.  He love [sic] to go camping, fishing, working on the farm, go to the lake and playing music.  Dad love [sic] to take the family camping.  He love [sic] having fun at the park riding rides . . .  Dad love [sic] to go fishing with anyone that wanted to fish."  The letter is clear, logical, and coherent if it were written by an elementary school child, and not a 43-year-old adult.

      Should the Court have any questions or doubts as to the severity or nature of Donnie's intellectual disabilities, the defense urges the Court to request testimony from the various mental health professionals that have examined Donnie.  The professionals that have had the most contact with Donnie are Dr. Michael Rutter, Ms. Cindy Barletta, and Dr. Kari Schlessinger.  All three professionals opined that Donnie would benefit from counseling and mental health treatment.  Dr. Rutter and Ms. Barletta opined that Donnie could be appropriately monitored in the community, while Dr. Schlessinger was never asked her opinion.

## VI.     Other Cases Referenced in Donnie's Sentencing Memorandum

      The government seemingly takes issue with 18 U.S.C. § 3553(a)(6) -- the sentencing factor regarding "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct" -- and deems such an examination a "meaningless exercise."  Dkt. 77 at 23.  However, in the very next paragraph, the government apparently realizes that such a "meaningless exercise" is the law and discusses the cases cited by the defense in its sentencing memorandum.  In its sentencing memorandum, the defense purposely restricted the facts of these cases to the plea agreement, but the government in its response delves deeper into each case.  *Id*.  However, in doing so, the government leaves out crucial details.

For *United States v. Taouzinet*, 16-CR-6021-FPG, the government provides misleading and grossly deficient information: "the defendant was in his 20s and believed the victim with whom he had been chatting online was 17." Dkt. 77 at 23. The government leaves out that the Taouzinet actually raped a 13-year-old girl, who frequented his corner store. Specifically, Taouzinet "had communicated with [a 13 year old minor victim] about having sex and had in fact met with her over the previous evening, where the two engaged in sexual intercourse." 16-CR-6021-FPG, Dkt. 1 at 2. Taouzinet knew the minor victim from his job at the store and actually thought she was 12-years-old. *Id*. Law enforcement interviewed the minor victim's mother, who told confirmed that Taouzinet knew the age of the minor victim. *Id*. at 4. Law enforcement also reviewed the minor victim's phone, which revealed pornographic photos of Taouzinet and other adults. *Id*. at 5. Taouzinet received a 60-month sentence.

For *United States v. Kurowski*, 16-CR-94-LJV, the government again provides misleading and grossly deficient information: "the defendant was 22-years old at the time of the offense, which involved communicating with a 17-year old victim, and suffered from anxiety, depression, narcolepsy, and suicidal thoughts." Dkt. 77 at 23. The government leaves out three other victims. Kurowski "attempt[ed] to convince" a 13-year-old minor victim (Victim 1) to meet him for sexual intercourse and asked her to masturbate over Skype. 16-CR-94-LJV, Dkt. 1 at 2-4. Kurowski asked Victim 1, "You wanna see my dick? . . . I wanna see you and hold you and make out with you and grab your titties and I wanna fuck you in lots of fun ways especially cause your so small it'll be amazing cause I can hold you up and whip you around." *Id*. at 3. Similarly, Kurowski attempted to convince a 15-year-old minor victim (Victim 2) to meet him for sexual intercourse. *Id*. at 5-6. Kurowski even offered Victim 2 alcohol in exchange for oral sex. *Id*. at 6, 9. This solicitation occurred after Kurowski had been charged with soliciting

9

another minor. *Id*. at 9-10.  Kurowski's phone had been seized in that case, but he was able to obtain another one to communicate with Victim 2.  *Id*.  Kurowski solicited a 16-year-old minor victim (Victim 3).  *Id*. at 11.  Victim 3 told law enforcement that she sent Kurowski pictures and videos because Kurowski threatened her and said he would hurt her.  *Id*.  Kurowski also asked Victim 3 if he could film them having sexual intercourse.  *Id*. at 13.  The only victim that Kurowski was required to plead guilty to was the 17-year-old (Victim 4) he solicited.  *Id*. at 13-14.  Victim 4 and Kurowski exchanged erotic pictures of themselves.  *Id*. at 14.  Kurowski also requested oral sex from Victim 4 and eventually Victim 4 sent Kurowski pornographic images of herself.  *Id*. at 12, 15.  Kurowski received a 30-month sentence.

The government mitigates Kurowski's conduct by purposely citing Kurowski's Statement with Respect to Sentencing Factors and references his anxiety, depression, narcolepsy, and suicidal thoughts.  Dkt. 77 at 23.  The same logic should apply to Donnie, who suffers from a lifelong, diagnosed intellectual disability.

Lastly, for *United States v. Ahmad*, 11-CR-6130-DGL, the government only cites the victim and the victim's family's support of Ahmad.  Dkt. 77 at 23-24.  Ahmad raped and video recorded his rape of a 13-year-old related to him by marriage.  11-CR-6130-DGL, Dkt. 1 at 2, 3.  The video was discovered by the minor victim's sister on Ahmad's video camera.  *Id*.  When law enforcement questioned the minor victim, she indicated that Ahmad "inserted his penis into her rectum while she was sleeping . . . [the defendant] had done this to her numerous times beginning approximately when the victim was in the fifth grade."  *Id*. at 4-5.  Ahmad received a 36-month sentence consecutive to his 33-month state sentence, for a total of 69-months.

10

**VII.    A 24-Month Sentence is Appropriate**

Due to Donnie's significant intellectual limitations, the extremely uncharacteristic and isolated nature of his criminal conduct, and his low risk for a contact offense and/or repeating the instant offense, a 24-month sentence followed by extended supervision with any and all conditions this Court deem appropriate will serve the purposes of sentencing.

**DATED:**     August 6, 2018
              Buffalo, New York

Respectfully submitted,

**/s/Frank R. Passafiume**
Frank R. Passafiume
Assistant Federal Public Defender
Federal Public Defender's Office
300 Pearl Street, Suite 200
Buffalo, New York 14202
(716) 551-3341; 551-3346 (fax)
frank.passafiume@fd.org
*Attorney for Donald Gardner, Jr.*

**TO:**   Douglas Penrose
          Assistant United States Attorney

          Natalie Whitman
          United States Probation Officer