1                    UNITED STATES DISTRICT COURT

2                    WESTERN DISTRICT OF NEW YORK

3

4

5  - - - - - - - - - - - - - -X
   UNITED STATES OF AMERICA              15-CR-179(G)
6
   vs.
7                                        Buffalo, New York
   DONALD GARDNER,                       August 9, 2018
8              Defendant.                10:48 a.m.
   - - - - - - - - - - - - - -X
9

10

11                    TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE FRANK P. GERACI, JR.
12                UNITED STATES DISTRICT CHIEF JUDGE

13

14                    JAMES P. KENNEDY, JR., ESQ.
                      United States Attorney
15                    BY: DOUGLAS A. PENROSE, ESQ.
                      Assistant United States Attorney
16                    138 Delaware Avenue
                      Buffalo, New York 14202
17

18
                      MARIANNE MARIANO, ESQ.
19                    Federal Public Defender
                      BY: FRANK R. PASSAFIUME, ESQ.
20                    Assistant Federal Public Defender
                      300 Pearl Street, Suite 200
21                    Buffalo, New York 14202
                      Appearing on behalf of the Defendant
22
   ALSO PRESENT:      Natalie Whitman, U.S. Probation Office
23

24 COURT REPORTER:    Christi A. Macri, FAPR-CRR
                      Kenneth B. Keating Federal Building
25                    100 State Street, Room 2120
                      Rochester, New York 14614

2

1                    **P R O C E E D I N G S**

2                    *          *          *

3              (**WHEREUPON**, the defendant is present).

4              **THE CLERK:**  Criminal action 2015-179, United States

10:48:40AM 5  vs. Donald Gardner.

6              Counsel, please state your name and the party you

7    represent for the record.

8              **MR. PENROSE:** Good morning, Your Honor, Douglas

9    Penrose for the United States Government.

10:48:51AM 10             **MR. PASSAFIUME:** And Frank Passafiume for

11   Mr. Gardner, Judge.

12             **THE COURT:** Good morning.  Are you Donald Gardner?

13             **THE DEFENDANT:** Yes, I am.

14             **THE COURT:** This matter's on for sentencing.  The

10:49:05AM 15 Court does have the presentence report, and I have extensive

16   filings actually from both sides, including a statement by the

17   Government, a statement by the defendant, a number of letters

18   on behalf of the defendant, and the Court's had an opportunity

19   to review all those documents actually a couple of times.  I'm

10:49:33AM 20 fully aware of them.

21             Does the Government want to first be heard on any

22   of the issues related to the filings?  Do you have any

23   objections to the presentence report?

24             **MR. PENROSE:** No, Your Honor.

10:49:43AM 25             **THE COURT:** Okay.  Mr. Passafiume, do you have any

1  objections to the presentence report?

2           **MR. PASSAFIUME:** No, Judge.

3           **THE COURT:** Okay.  Does the Government want to be

4  heard on sentencing?

10:49:53AM 5           **MR. PENROSE:** Yes, Your Honor, thank you.  Your

6  Honor, this was a serious offense and the defendant's sentence

7  should reflect this.  The Government's position is that a

8  guideline sentence of 120 months is appropriate and our

9  written submissions fully set forth the reasons why we believe

10:50:10AM 10  this to be the case.

11           I don't propose to go through those again in full,

12  but what I would like to do is focus primarily on the

13  defendant's conduct and also on the defendant's mental

14  limitations.

10:50:24AM 15           The conduct that the defendant engaged in and was

16  the basis for his plea was purposeful.  He contacted the

17  victim, he requested the sexually explicit pictures.  It was

18  deceitful.  He had a picture on his Facebook profile of a

19  young boy, and he refused to answer the phone when the victim

10:50:42AM 20  tried to call.

21           Now, defense counsel takes issue with how the

22  Government interprets those facts.  But the most important

23  fact is that the defendant repeatedly lied about his age,

24  repeatedly saying that he was a 14-year-old boy.

10:50:57AM 25           Defense counsel says that the victim had an inkling

she was communicating with an adult, and I assume defense
counsel is not insinuating that the victim is to blame for not
knowing that the defendant was an adult, but what is relevant
is the defendant's repeated statements that he was a
14-year-old boy and his repeated denials that he was not an
adult.

His conduct was persistent.  He made repeated
requests for sexually explicit pictures and he detailed
exactly what he wanted.  As the chats reflect, he made
requests such as can you show me your asshole; open your ass
cheeks, take pic; I will answer if you send me pic of your
pussy open so I can see pussy hole; can I see your legs
spread.

These are not the actions of someone who is simply
curious.  And at the end of the day, they result in the
victimization of a 10-year-old girl.

The defendant's conduct while on pretrial release
is also relevant, and here we have several violations of his
release conditions, ultimately resulting in his being remanded
to federal custody.

Defense correctly points out that some of his
pretrial conduct, specifically the text messages he
inadvertently sent to his supervisor were not violations of
his conditions, they were communications between two adults.

But as both his supervising officer and Ms. Cindy

1  Barletta agreed, this was clearly high-risk behavior, and

2  ultimately the defendant was remanded to federal custody on

3  the basis of a violation of his release conditions.

4          And the basis for this was he went to a job

10:52:50AM 5  interview and was supposed to only go to the job interview and

6  instead went to two other locations.

7          Now, according to the presentence report, which the

8  defense has adopted without objection, the defendant knew he

9  should have called his supervising officer and alerted the

10:53:10AM 10  officer to the change in plans.  But he gave in to himself.

11  Someone who gives in to himself and contradicts their release

12  conditions is not someone who does what people in authority

13  tell him to do, which is how the defense characterizes the

14  defendant.

10:53:34AM 15          Now, there's certainly no dispute that the

16  defendant has mental limitations and that they are genuine.

17  The Government has never disputed this.  But they did not

18  prevent the defendant from engaging in the conduct that was

19  the basis for his plea, it did not stop him from contacting

10:53:54AM 20  two other minors and requesting nude pictures from them.

21          And briefly on that point, the Government's not

22  asking the Court to infer anything with respect to Facebook

23  chats with those two other minors.  The Government is simply

24  asking the Court to consider the statements made by these

10:54:15AM 25  minors, statements in which they say that the defendant

1    requested nude pictures of them, statements which have not

2    been contradicted.  And if true, that conduct would be

3    consistent with the conduct that forms the basis of the

4    defendant's guilty plea.

10:54:36AM 5          Nevertheless, the defendant's mental limitations

6    are certainly something that the Court should take into

7    consideration in fashioning a sentence.  And, again, the

8    Government agrees with defense counsel that whatever the

9    medical diagnosis is, whatever the correct terminology is,

10:54:52AM 10   intellectual disability mild, intellectual mild severity, the

11   defendant's impairments are significant.  There's no question

12   that all the professionals that evaluated the defendant agree.

13          Defense takes issue with the fact that the

14   Government did not seek out an opportunity to learn firsthand

10:55:13AM 15   of the defendant's limitations.  However, I have a feeling

16   that had we actually done so and arrived at perhaps a

17   different opinion as to the defendant's limitations, that

18   defense counsel -- defense counsel would perhaps rightly

19   criticize us for having the opinion of an unqualified lay

10:55:31AM 20   person.

21          Instead what the Government did was the Government

22   relied on the professionals who evaluated the defendant and,

23   in fact, went further.  Not only do we -- we rely on the

24   professionals, many of whom were retained by the defense, we

10:55:46AM 25   went as far as adopt the framework defense counsel urged,

1    specifically evaluating the defendant's adaptive functioning

2    skills.  These types of skills include schooling, employment,

3    romantic relations, whether an individual can properly care

4    for himself or herself.

10:56:06AM 5         And it is the Government's view that the

6    defendant, indeed, possesses many of these skills.  He

7    graduated high school, certainly with academic support; he has

8    been able to hold gainful employment not only at Lee's Feed

9    for a significant period of time, but at other businesses.

10:56:27AM 10        And I would note that there are several instances

11   of him returning to the same employer which would seem to

12   indicate that as the defendant stated, he left many jobs not

13   because he was unable to meet the requirements of the job, but

14   rather because he wanted a job with more hours or closer to

10:56:45AM 15  home or that paid more.

16        The defendant has had several romantic

17   relationships, at least one of which was serious enough he

18   lived with his girlfriend at the time.

19        And he has also been able to properly take care of

10:57:01AM 20  his personal needs while incarcerated.

21        On this basis the Government concludes and is

22   joined in that conclusion by Drs. Cervantes and Heffler and

23   Schlessinger that the defendant does, in fact, have adaptive

24   functioning skills.  Dr.  Cervantes and Dr. Heffler stated

10:57:24AM 25  overall the defendant demonstrates good adaptive functioning.

1  Dr. Schlessinger similarly concluded that despite his

2  intellectual limitations, the defendant exhibited adaptive

3  functioning skills.

4         Very briefly I will address the treatment summary

10:57:42AM 5  prepared by Ms. Cindy Barletta and I would just like to make

6  clear that being new to the district and new to the

7  U.S. Attorney's Office and, indeed, new to Buffalo, I am

8  wholly unfamiliar with Ms. Barletta, her clientele, her prior

9  reputation.

10:58:02AM 10         The basis of the Government's analysis is solely

11  her treatment summary, which she submitted to this Court and

12  in which she states that the defendant was not expected to

13  provide any details regarding the circumstances of his conduct

14  that gave rise to the plea.

10:58:22AM 15         And in the Government's view, that significantly

16  impacts her ability to evaluate the defendant with respect to

17  making a sentencing determination and what might be relevant

18  for that determination.

19         I have no reason to doubt that she is an excellent

10:58:39AM 20  counselor, but she was not given the benefit of all the

21  factors that in the Government's opinion are relevant to

22  determining a sentence.

23         So, in sum, we have a defendant who engaged in

24  purposeful conduct, who sought out sexually explicit pictures

10:59:01AM 25  from a 10-year-old girl.  He made repeated requests and he was

1  ultimately successful in achieving his goal.

2              He certainly has mental limitations, but they

3  didn't stop him from engaging in the conduct which form the

4  basis of his plea, and the medical professionals who evaluated

10:59:22AM 5  him all concluded that he despite his limitations, he does

6  function quite well.

7              For that reason the defendant needs to be given a

8  sentence that reflects his conduct and reflects his actions,

9  and so the Government's position is further supported by its

10:59:47AM10  written submissions that a sentence of 120 months is

11  appropriate.

12              Thank you.

13              **THE COURT:** Thank you very much.  Mr. Passafiume.

14              **MR. PASSAFIUME:** Judge, thank you.  And I apologize,

10:59:57AM15  I am very nervous right now because, you know, my mentors,

16  Judge, guys like that in my life warned me about cases like

17  this, and these cases are so unique that I will remember them

18  for the rest of my career and my life and these are cases that

19  become more than a case.

11:00:17AM20              And I don't represent the defendant in

21  U.S. vs. Donald Gardner, Jr.  I represent Donnie; I represent

22  his mom Carol that's back there; I represent his brother Doug

23  that's back there; and I represent Donnie's late father Don,

24  Senior.

11:00:29AM25              And I'm nervous for them and I do hope I do this

1    right.  I know that Donnie and his family are also terrified

2    and nervous.

3           More importantly, I know that Donnie is truly

4    remorseful for his conduct.  And that remorse started way back

11:00:43AM 5    when back in October of 2014 when he was first confronted by

6    agents he admitted his involvement, he apologized and he

7    promised not to do anything like that again.

8           The case wasn't indicted and he wasn't arrested

9    until a year later, October 2015.  And in that year period

11:01:02AM 10    there's not a single allegation of inappropriate behavior or

11    criminal conduct.

12           And through the pretrial counseling with

13    Ms. Barletta, Donnie's come to realize how wrong his conduct

14    was and how severe his crime is.  He understands the proper

11:01:20AM 15    boundaries and he knows not to cross them.

16           That's why he stands before the Court today, Judge,

17    with his plea of guilty.  And I do commend the Government for

18    agreeing to this resolution that leaves sentencing completely

19    up to Your Honor.  There's no mandatory minimum, Your Honor

11:01:37AM 20    has the full range of sentence possibilities, and that allows

21    the Court to not only recognize the seriousness of this

22    offense, but also Donnie's significant and severe intellectual

23    disability.

24           His disability is both simple and complex, and I

11:01:54AM 25    say that because of this: In its simplest form his aunt says

1    it best, Donnie's a really good kid.  People that know Donnie

2    well, like his family, his aunt, Ms. Perrin who has a letter

3    to the Court, she's the Gardner family attorney, they all

4    describe Donnie as child like.

11:02:15AM 5    Obviously, he's not a kid, he's a 43-year-old man,

6    but he functions significantly under his age due to his

7    intellectual disability.

8    Donnie's mom puts it best.  Donnie talks a lot, but

9    doesn't say a lot, just like a child.  And in its complex

11:02:35AM 10   form, Donnie has been diagnosed with low end borderline range

11   of intellectual functioning, mild mental retardation,

12   intellectual disability mild severity, borderline intellectual

13   functioning, and these are all from the numerous mental health

14   professionals that have evaluated Donnie, not just in this

11:02:52AM 15   case, but over his lifetime because these limitations were

16   evident at a very young age.

17   He did not learn to speak until 3, he was held back

18   in the first grade, he was removed from general classes and

19   placed in special education classes in the fourth grade, he

11:03:08AM 20   attended BOCES in high school, but because he was still

21   reading at a third grade level, he didn't complete the

22   program.

23   In school he was referred to a couple evaluations,

24   and Your Honor has them as part of the submissions.  One is by

11:03:24AM 25   this Dr. Lazaro.  And Dr. Lazaro conducted this Wexler test,

1  which I'm sure Your Honor's familiar with, and Donnie scored a

2  70.  The average score for a normal functioning person is 100,

3  and Donnie scored a 70.  That's lower than scores of people

4  that have Asperger's and autism spectrum disorder.

11:03:43AM 5          And of the findings that Dr. Lazaro made at that

6  young age was that Donnie was deficient in practical

7  reasoning, the ability to articulate socially accepted norms,

8  arithmetic skills, concentration ability, attention span,

9  verbal abstracting skills, the ability to perceive the

11:04:02AM 10  correlations between objects and events, and the ability to

11  differentiate between essential and non-essential details in

12  his surroundings.

13          As a result, Dr. Lazaro first diagnosed Donnie to

14  be low end borderline range of intellectual functioning with

11:04:18AM 15  that 70 score.  If he had a point less, a 69, he would be at

16  the very bottom of the scale.  He was just above in that low

17  end borderline range.  One point less, he's low end.  There's

18  no borderline.

19          Fast forward now to 30 years later, early in this

11:04:35AM 20  case we did retain Dr. Rutter to evaluate Donnie.  He

21  diagnosed Donnie with mild mental retardation with significant

22  intellectual and developmental deficits.  This diagnosis

23  causes severe difficulties in social perception and

24  interaction.

11:04:52AM 25          And Dr. Rutter specifically opined that these

1   difficulties stemming directly from Donnie's disability

2   contributed to this offense here.

3          Some of the language in Dr. Rutter's report and

4   even Ms. Barletta who gave the treatment summary prior to Dr.

11:05:11AM 5   Rutter's report raised questions of competency and that's why

6   the defense, again with the blessing of the Government,

7   retained Dr. Cervantes and Dr. Heffler to conduct strictly a

8   competency evaluation.  And the purpose of that evaluation was

9   not to get into any in-depth diagnosis or treatment or

11:05:26AM 10   anything like that.  It was strictly because of competency.

11          And Dr. Heffler ultimately diagnosed Donnie with

12   this intellectual disability mild severity.

13          When Donnie's bail was ultimately revoked, the --

14   without objection from the Government, the defense requested

11:05:45AM 15   this competency evaluation from the Bureau of Prisons.  And a

16   BOP doctor -- again, a BOP doctor diagnosed Donnie with

17   borderline intellectual functioning, and said that Donnie

18   clearly suffers from a genuine and significant intellectual

19   and cognitive impairment.

11:06:04AM 20          So what does this all mean?  What is mental

21   retardation, intellectual disability, borderline functioning?

22   It means that people with disabilities like Donnie have

23   problems in every day adaptive functioning, judgment, and

24   academic and occupational achievement.  And, sadly, Donnie is

11:06:25AM 25   deficient in all of these.

1          He's never lived alone, he does not have the

2    ability to live independently.  He relies on his mother for

3    everything.

4          He struggles to maintain employment.  After high

11:06:39AM 5    school graduation he worked 23 jobs in ten years, all food

6    service or labor jobs.  He's never been asked to be a cashier

7    or communicate with customers at any of these jobs.  He was

8    let go from all of these jobs because he couldn't meet work

9    standards.  Not because of enough hours, that's what you tell

11:06:57AM10   somebody when you don't want to say you were fired -- I wasn't

11   getting enough hours, so I left.  He left because he could not

12   meet those standards.

13          His longest job at Lee's Feed, this ten years, was

14   a favor to his late father.  His father was friends with the

11:07:10AM15   owner, was a customer of the owner, and that's literally the

16   only reason Donnie was there that long.  And soon after his

17   father -- Donnie's father was diagnosed with lung cancer,

18   Donnie was let go from that job as well.

19          At Lee's Feed, again, no cashier work, none of

11:07:25AM20   that.  He loaded and unloaded trucks, he loaded customer cars.

21   He didn't work customer service, he didn't work at a cash

22   register and that's because Donnie does not handle finances of

23   any kind.  He doesn't work with money, doesn't deal with

24   credit cards, doesn't know how they work, doesn't have a bank

11:07:44AM25   account, doesn't know how that works.  His mother pays all the

1    bills.  He is financially, socially and emotionally dependent
2    on his mother.

3            And she has no real expectation that Donnie will be
4    ever self-sufficient or able to support himself.  Again, he's
5    43 and his room in his house -- at his mom's house is still
6    the same as it was 25, 30 years ago.

7            Donnie's reports on his romantic relationships are
8    vague.  His mother does clarify them; they've all been with
9    women who are, too, intellectually disabled and they've been
10   superficial in nature.

11           And like I previously explained, Judge, Donnie did
12   not do well in school.  He was in special education classes in
13   elementary school; he was in BOCES in high school, but
14   couldn't complete it.  He was socially promoted throughout
15   his high school tenure at all these schools in the '80's,
16   which was common.

17           Dr. Rutter believes, and Ms. Barletta agrees, that
18   Donnie does try to conceal these deficits with short replies
19   and glibness.  And I think Your Honor saw that firsthand
20   during the plea colloquy.

21           Without knowing Donnie's full range of
22   disabilities, it was kind of an awkward, odd plea colloquy if
23   you remember way back when.  But now knowing everything and
24   placing that in context, I think Your Honor saw exactly what
25   these doctors see.

1          Ms. Barletta, the treatment summary that she

2    completed that the Government just referenced, was done very

3    early on in this case.  I spoke to her after the treatment

4    summary.  In fact, the treatment summary was done before we

11:09:23AM 5    even retained our first expert.

6          After speaking with her and after the treatment

7    summary was drafted, she was well aware of Donnie's case.  She

8    had the indictment, she even had the potential plea agreement,

9    which is why we're here today.

11:09:39AM 10          And her letter that she drafted for Donnie's bail

11    revocation, which is attached as a separate exhibit in the

12    papers, she was well aware of everything when she drafted

13    that.  And that says Donnie is not a danger, that he would do

14    well in the community, that he responds well to counseling.

11:09:54AM 15    That was done all after-the-fact.  That treatment summary was

16    first thing in this case, it was the first domino.

17          Ms. Barletta agrees with Dr. Rutter and she does

18    warn that Donnie tends to rub people the wrong way at times

19    because of his socially inappropriate reactions.  He doesn't

11:10:10AM 20    think before he speaks and he does not process social cues

21    well.

22          She found Donnie to be an extremely concrete

23    thinker with limited cognitive and intellectual ability.  She

24    said that Donnie is not able to make well thought out

11:10:26AM 25    decisions independently, he cannot problem solve, and he

1    cannot consider the consequences, which leads us to why he's

2    here today, to the crime, Judge.

3         Donnie's -- I want to make this clear, his

4    disability is not meant to excuse his conduct.  I'm just

11:10:43AM 5   trying to explain his conduct.  I'm trying to explain why

6    someone with no criminal history whatsoever, that is not a

7    pedophile, that doesn't view or collect child pornography,

8    that's never abused a child, that has no prior history of

9    sexual offenses, let alone ones involving children, that has

11:11:01AM 10   no prior offenses, let alone those like voyeurism or loitering

11   which are seen as precursors to more serious sexual offenses,

12   why someone like that engages in this conduct.  Donnie's never

13   been a part of any online clubs or chat rooms related to child

14   pornography.

11:11:19AM 15        The poor criminal conduct here happened during the

16   ten minute span with a victim who sent three pornographic

17   images of herself to Donnie in this ten minute span.  And

18   there's one victim.  I know there's talk of these other two,

19   but there's no Facebook records relating -- backing up those

11:11:34AM 20   other two statements, who are classmates of the victim.

21        Donnie never threatened nor coerced the victim to

22   send the pictures .  No physical contact was alleged nor was

23   it even suggested by Donnie.  In fact, he went at all costs to

24   avoid contact with the victim.

11:11:53AM 25        There are no Facebook searches on his page or chat

1    rooms associated with child pornography.  There was not a

2    single picture of child pornography, aside from the three

3    pictures here that he's pled guilty to, on any of the five

4    devices seized by the Government and searched by the

11:12:09AM 5    Government.

6         There's no evidence that Donnie attempted to tamper

7    or alter his Facebook page and his Facebook account after the

8    crime.  And even though admittedly Donnie had a picture of a

9    child on his Facebook profile image, defense forensic expert

11:12:24AM 10    Jerry Grant, which I know Your Honor knows well, indicates

11    that -- he says that Donnie was not specifically targeting

12    underage girls with any of his communication based on

13    Mr. Grant's thorough review of Donnie's entire Facebook page,

14    his entire Facebook account.

11:12:42AM 15         And if Donnie was attempting to hide his identity,

16    he was doing a bad job of it.  His Facebook name was

17    Donnie.Gardner.965, which everybody saw.  There were pictures

18    of himself on his Facebook page.  There's communications on

19    his page saying that he worked at Lee's Feed.

11:12:59AM 20         In fact, law enforcement used Donnie's Facebook

21    page as a way to get to Donnie.  That was the tool to locate

22    Donnie and arrest him.  He wasn't hiding in plain sight,

23    Judge.

24         So how does this Court -- how is this Court assured

11:13:15AM 25    that this conduct won't repeat itself?  I think there is --

1  which almost makes this case unique, there is a track record

2  to -- to assure the Court that this won't repeat itself.

3          First, again, like I mentioned, the year between

4  the search warrant execution where Donnie gave the statement

11:13:32AM  5  and was made aware of these charges and the arrest, there's no

6  allegation of inappropriate behavior or criminal conduct,

7  anything like that.

8          There's also this risk assessment by Dr. Rutter,

9  and Dr. Rutter stated that Donnie does not exhibit symptoms

11:13:50AM 10  consistent with a pedophile and that his risk of recidivism is

11  low. He said that Donnie is not a danger to himself nor

12  others.

13          Likewise, Ms. Barletta, who spent the most time

14  with Donnie out of all these counselors, determined Donnie to

11:14:06AM 15  be a low risk of committing a contact offense.

16          Both Dr. Rutter and Ms. Barletta said that Donnie

17  is not a predator; that he does not present with anti-social

18  personality disorder; they both believe that he would benefit

19  most from sexual offense specific education; and that he can

11:14:25AM 20  appropriately be monitored in his home.  Not in jail, but in

21  his home.

22          Dr. Schlessinger, the BOP doctor, also found that

23  Donnie would benefit from cognitive remediation training and

24  psychoeducation to target his specific deficits.

11:14:44AM 25          She was never asked to opine or give an opinion on

1  whether that could be done in a community or in jail.  That

2  was not her job.  But she did agree with Dr. Rutter and she

3  did agree with Ms. Barletta regarding treatment that would

4  work for Donnie.

11:14:59AM 5       And she even went as far as to note, which I

6  thought unique in this BOP evaluation, that Donnie's first

7  time at counseling was at New Step with Ms. Barletta and that

8  was his first experience ever with mental health counseling

9  and that he enjoyed it, he enjoyed going, he truly did.  He

11:15:16AM 10  had a great rapport with Ms. Barletta.

11       And it ties into Dr. Schlessinger's opinion that

12  Donnie's ability to think and reason in every day situations

13  is impacted by his disability, and he is in need of support

14  with communication, daily living skills, and socialization

11:15:39AM 15  and that all can be done out of custody.

16       The best support for Donnie is living at home with

17  his mother on that farm.  He has the same room he grew up in,

18  it looks exactly the same.  There's drum sets, there's NASCAR

19  stuff.  He helps his mom around the farm with basic chores,

11:15:56AM 20  basic repairs and farm duties.

21       His mom calls him an expert fence repairman for

22  fixing a couple fences and -- around the property.  He's

23  learned to change a flat tire on a tractor from watching his

24  father for 30 years.

11:16:14AM 25       Donnie is also very close to his brother Doug, who

1   is here.  Doug lives close by, speaks with Donnie regularly.

2            And I know I talk about Donnie's mom Carol's health

3   issues a little bit in my memo, and I'm going to make clear,

4   if God forbid if something ever happened to Donnie's mom, Doug

11:16:30AM 5   is right there to step up and be there for his brother.

6            Because Donnie, unfortunately, doesn't really have

7   many real friends.  His mom and his brother is all he has

8   left.  They're all that's left because his dad died at the

9   time this case started where he was healthy one day, diagnosed

11:16:46AM10   with lung cancer and seven months later he passed, which tore

11   Donnie up inside.

12            He idolized his father.  He wanted to do everything

13   his dad did.  He still does.  This is why he promised his dad

14   right before he passed that he would take care of his mom, and

11:17:01AM15   now he's in this predicament and it's double the tearing up,

16   Judge.

17            Donnie's mom, as I mentioned, has her own health

18   issues, but she's a rock.  She's a cancer survivor.  She's

19   here.  She's had two hip surgeries, major eye surgery all in

11:17:21AM20   the past year, but she's here.  She's unstoppable.

21            She's here, she's been at every court appearance

22   and she knows every detail of Donnie's case.  And she supports

23   him, and she's committed to help Donnie return to the

24   community as a law-abiding member of society, Judge.

11:17:37AM25            In addition to these -- I'm almost done, and I

1    apologize, I know I'm going long -- but the Court also has

2    before it this solid track record of 16 months on pretrial

3    supervision before the bail revocation.

4              Donnie was violated for stopping at these two

11:17:53AM 5  stores during a job interview.  It was kind of a gray area

6    condition where his probation officer said you have permission

7    to go to see your counselor, Ms. Barletta; if you want to stop

8    at the corner store for milk on the way back, you can do that.

9              For the job interview -- it was after Donnie's

11:18:11AM 10 curfew, he went -- the manager at McDonald's there told him to

11   come back to complete paperwork, it was the dinner rush, and

12   Donnie stopped at these two stores.  He never got permission.

13   In the back of his mind he knew it, but he didn't quite know

14   it, and that's the issue here, Judge.

11:18:26AM 15            With concrete black and white conditions and

16   orders, he could follow.  It's these gray area ones.

17              And his mother kinda says that, she says that maybe

18   Donnie didn't fully understand.  It was a gray area.  He

19   didn't really fully understand.

11:18:43AM 20            But the clearly defined conditions, and I point to

21   the no internet, which is huge, he followed that.  Probation

22   examined Donnie's approved cell phone several times and not

23   only were there no inappropriate images, no child pornography,

24   nothing like that, but he didn't even access the internet, he

11:19:00AM 25 didn't click one button to get on the internet.

1         When Donnie's friend left a video game system at

2    the house that had internet access overnight and Probation

3    found it the next day, again, where Donnie had the

4    opportunity, he did not access the internet because that was a

5    condition of his release.  He followed that clear condition,

6    that black and white condition carefully.

7         When Donnie understands these clear directives, he

8    complies.  Ms. Barletta, the counselor that saw him the most,

9    concurs with that, Judge.

10        During this time on pretrial supervision Donnie

11   regularly attended counseling, he did well in counseling, he

12   maintained excellent communication with his counselor, with

13   his probation officer, and me.

14        He did not view or obtain child pornography.  He

15   didn't even access the internet.

16        He can -- this all means he can be monitored

17   appropriately in the community.

18        So, Judge, we are asking for this 24 month

19   sentence, this two-year sentence, with lengthy supervision to

20   follow.  I think supervision properly addresses all the 3553

21   factors.

22        Donnie's conviction, his sentence, the collateral

23   consequences of his conviction, the sex offender registration

24   classifications, all serve as a notice to Donnie to compel

25   lawful behavior.

1          And he's also on notice for the potential

2   consequences should he behave unlawfully.   While on

3   supervision he's going to have a laundry list of conditions,

4   all these assessments, treatments, limitations on computer and

5   internet, this electronic monitoring, which in the Northern

6   District is GPS monitoring, it's not what you have here in the

7   Western District. And he has limitation for being around kids.

8          Donnie can and will attend the programs suggested

9   by Drs. Rutter, Schlessinger and that he excelled in with

10  Ms. Barletta.

11         He's going to be required to register as a sex

12  offender.   That severely impacts his life on a daily basis.

13  Anyone with access to a computer will know what he looks like,

14  will know where he lives, know where he works, they'll know

15  what car he drives.

16         Judge, incarceration can also be especially cruel

17  and dangerous to people like Donnie with his disabilities,

18  especially with those convicted of child pornography offenses.

19  There are no special jails for him.   He's not eligible for a

20  psychiatric facility.   And because it's a child pornography

21  offense, he's not going to be eligible for any camp or minimum

22  security prison.

23         With everything that I'm saying and what this boils

24  down to, Judge, Donnie is not a predator, he does not pose a

25  danger to the community.   He can be appropriately monitored.

1          If the Court has any questions with Donnie's severe

2  and significant disabilities, I urge the Court to bring in

3  some of these counselors and hear testimony directly from

4  them.  You have all these reports.  There is no question that

11:21:54AM  5  this disability is severe, it is significant, and it is

6  life-long.

7          I believe, Judge, and I submit to you that a

8  two-year sentence for this isolated crime that occurred over a

9  ten minute span that by all indications will never occur again

11:22:08AM 10  is sufficient, but not greater than necessary.

11          Thank you, Judge.

12          **THE COURT:** Thank you very much, Mr. Passafiume.

13          Mr. Gardner, would you like to say anything to the

14  Court?

11:22:20AM 15          **THE DEFENDANT:** I'd like to say I'm very sorry it

16  happened and it will never happen again.  I don't need the

17  internet for nothing.  I just need to get -- need to go home

18  and help my mom on the farm because she's had, like he said,

19  two hip surgeries and had her eyes taken care of so she can

11:22:36AM 20  see better.

21          And right now she's got nobody but my brother once

22  in a great, great while because he works nights that -- he's

23  got a job he works nights at and once in a while he comes over

24  and helps her out, but then he's got to go to work and there's

11:22:48AM 25  days that he can't be there at all for her.

1          She has two cows and three horses that she tries to

2     take care of, but she's not allowed to do anything on any of

3     the equipment because of her hip surgery right now.  They

4     won't let her do nothing.  The only thing she can do is drive

11:23:04AM 5     her car and that's it.

6               **THE COURT:** Okay.  Anything else?

7               **THE DEFENDANT:** Nope.

8               **THE COURT:** What did you learn from all this?

9               **THE DEFENDANT:** Hmm?

11:23:11AM10               **THE COURT:** What did you learn from all this?

11               **THE DEFENDANT:** I learned that -- that I should

12     never done the crime and -- the crime and the crime will never

13     be done again and -- and that I don't like to be -- I don't

14     like to be in here.

11:23:27AM15               **THE COURT:** And how are you doing?

16               **THE DEFENDANT:** It's very scary.

17               **THE COURT:** How are you doing while in custody?

18               **THE DEFENDANT:** Doing good.  Nobody's bothered --

19     where they got me stationed right now, no one's bothered me.

11:23:37AM20     I got a couple people that I hang out with in case there's a

21     problem.  But other than that, I get along real good.

22               **THE COURT:** Thank you.  Anything else you want to

23     say?

24               **THE DEFENDANT:** Nope.  Thank you.

11:23:48AM25               **THE COURT:** I know his mom and his brother is here

1  as well?

2            MR. PASSAFIUME: Yes, Judge.

3            THE COURT: Would his mother like to say anything?

4            MR. PASSAFIUME: I didn't ask her.

11:23:57AM 5            THE COURT: I know you didn't.  I did.

6            MS. GARDNER: I'm a little short of hearing, sir.

7            THE COURT: If you could step up to that desk?  Is

8  that microphone on, Jane?  That first desk?

9            THE DEFENDANT: Yes.

11:24:15AM 10            MS. MARIANO:  She's going to sit, Your Honor.

11            THE COURT: That's fine.  If you could, first of

12  all, state your name for us?

13            MS. GARDNER:  My name is Carol Gardner.  I am

14  Donald's mother.

11:24:27AM 15            THE COURT: Ms. Gardner, I know you weren't

16  expecting this.  I've been watching you sit back there.  And I

17  also reviewed the materials submitted by Mr. Passafiume, so

18  I'm interested in if you have anything to say about this.

19            MS. GARDNER: Well, the only thing I can say is

11:24:48AM 20  Donnie's a very good son.  He works very hard for me.  If he

21  knows that I need something done, he does it before I even

22  think to tell him.  He's a very hard worker.

23            And I would really like him to come home.  And I

24  know from talking to him every two days on the phone and from

11:25:11AM 25  his letters he misses his father terribly.  He wants to be

1  home on the farm.

2          And this would never happen again.  If he'd

3  realized at the time, but Donnie -- Donnie doesn't have, say,

4  friends.  So anybody that smiles and is friendly to him, they

11:25:33AM 5  become his friends right away.

6          And I think he's learned that he doesn't ever want

7  to be in jail again.  Thank you, sir.

8          **THE COURT:** Okay.  Thank you, ma'am.  Did the

9  brother want to say anything?

11:25:50AM 10          **MS. GARDNER:** Doug, do you want to --

11          **MR. DOUG COX:** Yes, sir.

12          **THE COURT:** Okay.  Just maybe switch positions?

13  Again, if you could state your name?

14          **MR. DOUG COX:** My name is Douglas Cox.  I'm Donnie's

11:26:07AM 15  oldest brother.  I really could use his help at home.  I got

16  my hands full.  I work a lot, I try to help with the farm.

17  Having him home would help big time.

18          I know he's sorry for what he did, and I know

19  he's -- he's got everybody upset.  But I think he learned his

11:26:33AM 20  lesson and I'd like to see him come home.

21          **THE COURT:** Now, you work outside the farm; is that

22  right?

23          **MR. DOUG COX:** Yes, sir.  I work for Berry Global.

24  It's a plastic plant.  I work nights.  So between that and

11:26:49AM 25  trying to keep up with stuff at the farm, it's -- and keep up

1 | with my mom, it's a handful.

2 |        **THE COURT:** Okay.  Do you want to say anything else?

3 |        **MR. DOUG COX:** No.  That's about it.

4 |        **THE COURT:** Okay, thank you.  Again, I know you

11:27:03AM 5 | weren't expecting to talk, so I appreciate your willingness to

6 | do that.

7 |        **MR. DOUG COX:** Thank you, sir.

8 |        **THE COURT:** Thank you.

9 |        First of all, I want to commend both attorneys in

11:27:11AM 10 | this case.  The Government obviously for their position.  We

11 | have advocates here for different positions in this case and

12 | they both provide the Court with significant information to

13 | make an important decision.

14 |        Mr. Passafiume as well for the number of documents

11:27:29AM 15 | you submitted and the information.  I'm in a much better

16 | position obviously to make a fair decision in this case, which

17 | is the job, to look at this case separately, based upon the

18 | individual facts of this case, and the individual before me

19 | and make a judgment.

11:27:48AM 20 |        Thank goodness the Supreme Court realized that when

21 | they made the guidelines what they are is guidelines and not

22 | mandatory because they give a court a starting point, but not

23 | mandating a particular sentence so the Court can use its

24 | discretion appropriately.

11:28:06AM 25 |        This is a difficult case.  I think Probation and

1    everyone else has realized that the defendant pled guilty to

2    possession of child pornography.  He's 43 years of age.  He

3    did attend high school in a special education program.  He is

4    a United States citizen.

11:28:25AM 5          He has been in custody now for some 14 months based

6    upon violating some conditions of his release and they were,

7    quite frankly, some very technical violations regarding acting

8    outside the curfew of the parameters of where he was to be on

9    a particular occasion.  It did not involve any criminal

11:28:47AM 10   activity on his behalf.

11          This case involved the defendant having

12   conversations over Facebook with minor individuals, one in

13   particular which is the subject of this case in which the

14   defendant did ask that minor, who turned out to be a

11:29:07AM 15   ten-year-old girl, that he knew was a ten-year-old girl, to

16   send him photographs of her in nude positions and in lewd

17   positions.  He indicated in that communication that he was 14

18   years of age.

19          When confronted by law enforcement, he did admit

11:29:28AM 20   his involvement in this criminal activity.  Law enforcement

21   did execute a search warrant, looked at a number of devices,

22   and did find these three images on his Facebook account that

23   he solicited from the victim in this case.

24          Based upon this charge, there's a base offense

11:29:51AM 25   level of 32.

1       Because the victim was under the age of 12, there's

2  a four level upward adjustment.

3       A two level upward adjustment for the use of a

4  computer, being a phone.

11:30:05AM 5       A three level downward adjustment for his

6  acceptance of responsibility, resulting in a total offense

7  level of 35.

8       The defendant's criminal history category is a

9  level I based upon a lack of any criminal record here

11:30:20AM 10  whatsoever.

11       With a total offense level of 35 and a criminal

12  history category of I, the sentencing range would be 168

13  months to 210 months.  However, based upon the nature of the

14  charge, the maximum sentence is a ten year sentence or 120

11:30:41AM 15  months.

16       The Government is advocating for that sentence.

17  The defense is advocating for a sentence of 24 months.

18       The defendant was born in Syracuse.  He lives with

19  his parents on the farm until his father died of lung cancer

11:30:59AM 20  at the age of 68.

21       He does not have a driver's license, he does not

22  own a passport.  As indicated, he did work on the farm helping

23  his mother; had a variety of jobs throughout his lifetime,

24  many of which he lost based upon some of the limitations which

11:31:21AM 25  everyone agrees exist here.

1           The defendant has significant intellectual

2   limitations.  At times been deemed to be mildly mentally

3   retarded, intellectually deficient, a range of different

4   opinions regarding his limitations, but the consistency is

11:31:41AM 5   that he is quite limited.

6           Based upon that was a special education student.

7   Did make it through high school as a special education

8   student.

9           He's been listed at the low end of a borderline

11:31:53AM 10   range of functioning.  And as I stated, mildly mentally

11   retarded.

12           He did consume alcohol at the age of 16, but his

13   use was very infrequent.  There's no evidence of any substance

14   abuse here whatsoever.

11:32:08AM 15           Now, the acts here were obviously serious as you

16   understand and as pointed out by the Government.  A

17   ten-year-old girl was victimized in this case.  And

18   individuals who solicit photographs, lewd photographs from

19   young children victimize them.

11:32:26AM 20           In this case luckily they were not shared with

21   other individuals, but often they are shared through different

22   networks and then the individual is victimized forever because

23   it's never removed.

24           As I indicated, a search warrant was executed

11:32:46AM 25   subsequent to the discovery of this incident, and a number of

1  devices were checked and they were found to not have materials

2  on them.

3          While under supervision also the defendant, as

4  stated, was in possession of a -- through a friend had a video

11:33:07AM 5  capability for the internet, and that was checked by the

6  Probation Office and found that the defendant did not access

7  that.

8          There's been a range of opinions regarding his

9  risk, but for the most part I think everyone's agreed that he

11:33:22AM 10  would be a low risk to reoffend in the future.

11          He does lack the ability to really know social

12  bounds, and he's impulsive in his functioning is questionable.

13  He has been tested; full scale IQ at 75, which obviously would

14  be quite limited.

11:33:46AM 15          He's worked as a stock clerk on occasion; did work

16  for Lee's Feed for a number of years.  But lost a number of

17  jobs based upon his inability to conduct himself in an

18  appropriate manner socially.

19          There's no evidence whatsoever that the defendant's

11:34:06AM 20  had any contact with children, has no prior criminal history,

21  has no history of substance abuse.

22          As I indicated, the evidence is that he is

23  supportive of his mother, does work on the farm.

24          I was particularly impressed with the -- or I guess

11:34:23AM 25  touched by the letter he wrote relating to his father.  I

 1  noticed that he did get emotional today when his father was

 2  mentioned; he was very close to his father, and his death I

 3  think had a severe impact on him.

 4         But I think as Mr. Passafiume described that

11:34:43AM 5  letter, if you read it you would have really thought it came

 6  from a ten or 12-year-old child as opposed to a 43-year-old

 7  man.  I think that clearly demonstrates the limitations that

 8  this defendant has.

 9         The Court has to consider the seriousness of the

11:35:00AM10  offense, which I've done.  It is a serious matter.

11         Your history and character in determining the

12  appropriate sentence.   A sentence that's not greater than

13  necessary to accomplish all the purposes of sentencing.  To

14  deter you from engaging in this activity in the future, and

11:35:15AM15  also deter others from engaging in this type of activity in

16  the future.

17         Based upon all that the Court finds that a

18  guideline sentence would not be appropriate in this case.

19  That this does demand a variance regarding the sentence in

11:35:34AM20  this matter to be fair, and considering all the facts and

21  circumstances of this case.

22         Based upon all that, I agree with Mr. Passafiume

23  that a sentence of 24 months imprisonment is not greater than

24  necessary to accomplish purposes of sentencing, but does send

11:35:52AM25  the right message.  It does mean you'll be in custody for a

1  while longer, but I think that balances some punishment with

2  the understanding that you'll be supervised after that in

3  order to minimize any risk in the future.

4          So the Court does impose a period of 24 months to

11:36:14AM 5  the Bureau of Prisons.

6          Any cost of incarceration is waived.

7          That's to be followed by a five year period of

8  supervised release, with a number of conditions. And I have

9  read the reports from individuals who have examined

11:36:29AM 10  Mr. Gardner, and I believe that if he is provided with -- as

11  indicated by Mr. Passafiume -- concrete rules, he will follow

12  those rules and I'm confident of that.

13          During the five year period of supervision, the

14  defendant shall not commit any federal, state or local crimes.

11:36:50AM 15          He shall be prohibited from possessing any

16  firearms, ammunition or dangerous devices.

17          He shall not possess any controlled substances

18  unless prescribed by a physician.

19          He shall cooperate with the collection of a DNA

11:37:03AM 20  sample.

21          Since this offense is not related to illegal

22  substances and there's no history of substance abuse, any

23  mandatory requirement for drug testing is waived.

24          The defendant shall not use or possess any computer

11:37:19AM 25  data storage device or internet capable device unless he

1   participates in the computer and internet monitoring program

2   unless authorized by the Court or the United States

3   Probation Office.

4          He must provide U.S. Probation advanced notice of

11:37:36AM 5   any computer automated service or connected device that will

6   be used during this term of supervision.

7          Probation is authorized to install any applications

8   to surveil any activity on any computer or connected devices.

9   The defendant's required to pay the cost of any monitoring

11:37:56AM 10   services.

11          Probation shall be notified by electronic

12   transmission of any impermissible or suspicious activity or

13   communication occurring on any such computer or connected

14   devices.

11:38:11AM 15          The defendant must participate in a sex offense

16   specific treatment program and follow rules and regulations of

17   that program.  Probation shall supervise the details of his

18   participation in the program, including the selection of a

19   provider and schedule.  The defendant is not to leave

11:38:29AM 20   treatment until completed or is ordered by the Court.

21          And if inpatient is required at any time, that must

22   be ordered by the Court or consented to by the defendant.

23          He is required to contribute to the cost of any

24   services rendered.

11:38:46AM 25          He's not to have any deliberate contact with any

1    child under 18 years of age, excluding his biological or

2    adopted children, unless approved by the Probation Office or

3    by the Court.

4         He shall not loiter within 100 feet of school

5    yards, playgrounds, arcade or other places primarily used by

6    children under the age of 18.

7         In order to monitor the defendant's compliance with

8    not buying or subscribing to online services, the defendant

9    shall provide Probation with access to any requested personal

10   or business financial information.

11        He shall register with the state sex offender

12   registration agency in any state where he resides, is

13   employed, carries on a vocation, or is a student.

14        Probation is authorized to release the defendant's

15   presentence report to the New York State Board of Examiners

16   for classification purposes.

17        The defendant shall submit to a search of his

18   person, property, vehicle or residence upon reasonable

19   suspicion.

20        He shall submit to a polygraph computerized voice

21   stress analyzer or other testing not to exceed twice in a

22   calendar year, and an additional two retests per year as

23   needed.  The testing may include examination using the

24   polygraph computerized voice stress analyzer or other similar

25   device.

1          In this regard the defendant shall be deemed not to

2   have waived his Fifth Amendment right by making any such

3   statements.  The results of any polygraph pretests and

4   polygraph examinations may be disclosed to the United States

11:40:29AM 5   Probation Office, but shall not be further disclosed without a

6   court order.

7          The defendant again is required to contribute to

8   the cost of services rendered.

9          Because the defendant does not have the ability to

11:40:41AM 10   pay a fine, the Court is waiving any fine in this case.

11          Because he is indigent and he cannot afford to pay

12   the mandatory $5,000 Justice For Victims Trafficking Act

13   assessment, the Court waives that as well.

14          He shall pay a special assessment of $100, which

11:40:59AM 15   shall be due immediately.

16          In addition, I'm going to order that the defendant

17   be under electronic monitoring for a period of six months

18   following his release and during his period of supervised

19   release.

11:41:17AM 20          Anything else from Probation?

21          **MS. WHITMAN:** No, Your Honor.

22          **THE COURT:** Other counts to be dismissed?

23          **MR. PENROSE:** Yes, Your Honor.  Your Honor, at this

24   point the Government would move to dismiss the indictment.

11:41:44AM 25          **THE COURT:** Remaining counts of the indictment?

1        **MR. PENROSE:** I believe this was a superseding

2  information was the basis for the plea, so dismiss the

3  indictment in this case.

4        **THE COURT:** Yes, based upon that, the indictment

11:41:53AM 5  will be dismissed.

6              Anything further, Mr. Passafiume?

7        **MR. PASSAFIUME:** No, Judge.  Thank you.

8        **THE COURT:** Okay, Mr. Gardner, if you obey the

9  rules, Probation will be there to help you, programs you'll be

11:42:03AM 10  engaged in to prevent anything like this from happening again.

11              Your mother and brother, they need you home to help

12  them out.  I think you've got a very supportive family and

13  that goes a long ways in the Court's determination to impose a

14  sentence I decided in this case.

11:42:19AM 15              So don't let anybody down, do you understand?

16        **THE DEFENDANT:** I won't.

17        **THE COURT:** Okay, good luck.

18        **MR. PASSAFIUME:** Thank you.

19        **THE DEFENDANT:** Thank you very much.

11:42:25AM 20        **MR. PENROSE:** Thank you, Your Honor.

21              (**WHEREUPON**, proceedings adjourned at 11:42 a.m.)

22                        *    *    *

23

24

25

1      **CERTIFICATE OF REPORTER**

2

3           In accordance with 28, U.S.C., 753(b), I certify that

4   these original notes are a true and correct record of

5   proceedings in the United States District Court for the

6   Western District of New York before the Honorable Frank P.

7   Geraci, Jr. on August 9th, 2018.

8

9   S/ Christi A. Macri

10  Christi A. Macri, FAPR-CRR
    Official Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25